## JOHN RED v. THE STATE.

### No. 1407. Decided June 8, 1898.

1. **Murder — Evidence — Prior Acts and Conduct of Deceased Showing Fear of Defendant.**

On a trial for murder, where there was a direct conflict in the evidence as to who began the difficulty, it was competent for the State to prove that shortly before the homicide defendant, carrying a gun, came to the house of witness and called for deceased; and upon being asked if he was going to kill deceased, said "No," but that he was going to give him a "damn good whipping," and that about that time witness saw deceased fleeing from the house towards the brush as fast as he could. The testimony was admissible as tending to show fear and apprehension of defendant by deceased, and that he was not likely to have been the aggressor in the difficulty in which he was killed.

2. **Same—Evidence Too Remote.**

On a trial for murder, where the principal State's witness was both father to deceased and grandfather to defendant's wife, it was not competent for the State to prove by said witness that he owned land and had made no will disinheriting his granddaughter and entertained no ill feelings towards her or her husband prior to the killing of his son by the granddaughter's husband. The evidence was too remote.

3. **Same—Animus of Witness.**

Where the court, over defendant's objection, had admitted the incompetent remote testimony mentioned in the foregoing paragraph, it was certainly error to refuse to permit defendant to prove, as indicative of the animus of the witness, that since the homicide he had made a will in which he disinherited defendant's wife, his granddaughter.

4. **Same.**

As showing the animus of the principal State's witness, defendant was permitted to prove that he had accused the said witness of incest, sodomy, and assault with intent to rape defendant's wife, the said witness' granddaughter, and that about a month prior to the homicide he had threatened to prosecute him for said crimes if he (witness) did not leave him alone and attend to his own business, but the court refused to permit him to prove by other witnesses the truth of his accusations. Held, there is no rule of law which would authorize the court to turn aside and go into a trial to determine if the witness was guilty of said offenses.

**5. Same—Impeachment of Witness.**

Where it is sought to impeach a witness by showing accusations of crimes made by defendant against him, it must appear that said accusations had assumed the form of legal charges or complaints in prosecutions instituted. Following Ware v. State, 36 Texas Criminal Reports, 597.

**6. Murder—Self-Serving Declarations.**

On a trial for murder, what defendant might have said a few weeks prior to the homicide, in connection with his efforts and purpose to rent land, to the effect that he wanted to get away from deceased and his father for fear he would have trouble with them, was purely self-serving and inadmissible.

**7. Same—Impeachment of Wife as Witness—Contradictory Statements.**

On a trial for murder, where the wife of defendant as a witness had testified that she was present at the difficulty and saw all that occurred, and she was asked on cross-examination if on the morning after the homicide she had not met the sheriff and stated to him that she was not present and did not see the shooting, which she denied, Held, competent to impeach her as to this matter by the testimony of the sheriff.

**8. Same.**

Where the wife is a witness, it is not admissible on cross-examination to elicit from her testimony as to matter about which she has not been examined in chief; and where she is asked as to such matters and denies them, it is not competent to impeach her as to such matters. Jones v. State, 38 Texas Crim. Rep., 87; Gaines v. State, 38 Texas Crim. Rep., 202.

**9. Same—Opinion of Witness.**

On a trial for murder, it is incompetent to elicit the opinion of a witness as to the reason which occurred to her why defendant did not kill another person at the time he killed deceased.

**10. Evidence—Insulting Conduct Towards Wife.**

On a trial for murder, where there is no manslaughter in the case, it is not admissible to prove that deceased had repeated to a witness slanderous language used by a third party against the chastity of defendant's wife, where it does not appear that the matter had anything to do with the killing.

**11. Impeachment and Evidence to Sustain a Witness.**

Where a witness is impeached as to an isolated statement in regard to the commencement of the difficulty, it is not competent, in order to sustain the witness, to show what he had stated in regard to other facts in connection with the killing, or to show that he made statements as to other matters, upon which he was not impeached, corresponding with his testimony on the trial.

**12. Murder—Irrelevant Evidence.**

On a trial for murder, where deceased was the son of the principal State's witness and the latter was the grandfather of defendant's wife, it was incompetent and inadmissible to prove by defendant's wife, the granddaughter, that she had seen her grandfather, on several occasions, in bed with her mother, his daughter.

**13. Same—Mutual Combat—Charge.**

A mutual combat is where two parties mutually and willingly enter into a combat; as where they agree to go out and fight, and do so. A charge on mutual combat is uncalled for where the theory of the State is that the defendant, if he did not waylay deceased, was certainly the aggressor; and the theory of the defendant, that he slew deceased in self-defense. There could be no mutual combat in such a case.

**14. Bill of Exceptions to Omission in Charge.**

A bill of exceptions to an omission or failure of the court to charge upon any particular subject-matter, to be sufficient, should present the salient features of the evidence relied on requiring the charge on the given subject.

APPEAL from the District Court of Tarrant. Tried below before Hon. IRBY DUNKLIN.

Appeal from a conviction for murder in the second degree; penalty, fifteen years imprisonment in the penitentiary.

The indictment charged appellant with the murder of James Rogers, on the 25th day of July, 1896.

All the essential facts are stated in the opinion.

*W. R. Parker* and *O. S. Lattimore,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of fifteen years; hence this appeal.

The circumstances connected with the killing show that appellant and deceased were related, appellant having married the niece of the deceased. The grandfather of appellant's wife was D. C. Rogers, who owned a farm; and appellant and his wife lived in the same house with him—the house containing two rooms. Appellant worked a portion of the farm. Deceased, Jim Rogers, was a son of D. C. Rogers, and lived about 250 yards from the latter, and also farmed on a portion of the land of D. C. Rogers. It appears that, for some months or so antedating the homicide, bad blood had existed between defendant and deceased. About a week before the homicide, the State's testimony shows that on one occasion John Red, defendant, came over to the house of deceased, Jim Rogers, and cursed and abused him in regard to the children of the latter, and accused them of having pulled some peaches over at the house, and dared him to come out of his house, and declared that he would whip him, if he had to pull him from under his own bed to do it. It further appears from the State's testimony that deceased was in fear of appellant's attacking him, and, about a week or so before he was killed, procured a pistol. On the day of the homicide, deceased and his father, D. C. Rogers, left their home together about 1 o'clock in the evening; the latter going to the postoffice, and the former going to mill, carrying a bag of corn to be ground. The mill and postoffice were two and one-half miles from their home, and were situated not far apart. There were two roads leading to the mill. They traveled one in going, and the other in returning. In order to present the locus in quo of the killing, and the neighborhood and surroundings alluded to by the witnesses, we insert the diagram found in the record.

As the two Rogerses started to the mill, they passed one Eph Williams and defendant near a gate a short distance from the house. Appellant a short time before this had been seen by Eph Williams crouched in the brush along the road which led towards the mill. On seeing Williams, he got up and approached him, he having a gun at the time. They went to the house of appellant, meeting on the way the deceased and his father, as stated. Eph Williams and defendant remained at his house together a short time, and, in a conversation which ensued between them,

Eph Williams proposed to trade defendant a hog for some flour, which was declined by appellant. In a short while, Williams left the appellant's house, going in the direction of his home. The road he took led in the direction of the mill, some half a mile; his house being situated about 300 yards from said road. When Williams left, appellant and his wife were at their home. Between 3 and 4 o'clock in the evening, deceased and his father returned from the mill, taking a different road from that traveled by them in going. When they had gotten about a half or three-fourths of a mile of their home, they passed the wife of appellant at a gate at a certain hog pasture, which is about 500 or 600 yards north of where the killing took place, and some distance past the point where the path led from the road which Eph Williams followed. When they had gotten in about 300 or 400 yards of the home of D. C. Rogers, said Rogers states that he saw Red, the defendant, a little southeast from the road he was traveling—ten or fifteen steps from the road —coming out of the brush. He had a gun, and was within thirty or forty steps from witness. He then states the facts attending the killing, which we condense as follows: That he and his son were riding single file. That when he had gotten within 300 or 400 yards of his home he saw defendant, Red, thirty or forty yards distant, coming up out of the bushes, with his gun in his hand, from the east of the road, into the road before them. That he came right into the road, with his right hand

39th Crim. Rep.—27

holding his gun muzzle pointing down, and his right hand on the lock. He passed in between his horse and that of his son, "and got on the west side of my son, and said to him: 'You are packing a gun for me, and now, then, God damn you, use it.'" At this, witness wheeled his horse, and jumped off. Appellant had his gun pointing up. Could not say whether it was pointing towards his son or not. That he got in front of defendant, and tried to argue with him that his son was not packing a gun for him. Defendant backed several steps, still holding his gun in position; and he then said to witness, "If you don't stop, I will knock your God damn brains out." At this, witness got out of the way, and defendant then fired at deceased. After he fired, deceased fired two shots at defendant with a pistol. The gun defendant had was a single-barrel shotgun. He then broke and ran about twenty steps north; then appeared to be reloading his gun. That witness told his son to go on home. That he saw he was badly wounded. He started on, and witness followed, and when his son had ridden about eighty steps he fell from his horse. When he got to him, he still had the pistol gripped in his hand; and witness took the pistol from him, and pulled the sack of meal under his head. Defendant followed, and came up within about fifteen steps, and took a tree, and cursed witness, swearing that he would shoot if witness did not throw the pistol down. Witness refused to throw the pistol down. Witness turned his head, and saw appellant's wife coming down the road. At this, appellant left his tree, and went off north with his wife. That he then saw his son was dying, and left him in the road and went after help. His testimony shows that appellant's wife was not present at the shooting, and that she came up afterwards. Appellant testified on his own behalf in regard to the killing substantially as follows: That, when Eph Williams saw him with a gun near the road in the bushes, he was out hunting rabbits and birds, and when he saw Williams coming he just crouched down in the brush. That on the evening of the homicide, after Williams left his house, he concluded that he would go up and see Williams' hogs, and determine whether or not he would make a trade. That his wife went with him. That he carried his gun with him to kill any game he might see on the way, and that he frequently carried his gun. That, about the time they reached the place where the killing subsequently occurred, he stepped out in the brush to answer a call of nature, and his wife went on in the direction of Williams' house. That as he was coming out of the woods he saw D. C. Rogers and Jim Rogers coming south on their horses, towards home. Jim was riding on a sack of meal. That he got in the road and went on north, in the direction of Eph Williams' house. Just before he met them he came to where there had been an old road and a new road cut out; the roads being only a few feet apart. Just as he was getting in the old road, D. C. Rogers ran his horse across in front of him in the old road, and got down on the opposite side, and said to Jim: "Shoot him! Shoot him! This is as good a chance as you will have." That, as he rode in front of him, witness said, "What does this mean?" Rog-

ers made no reply, but told Jim to shoot. Jim then shot at defendant twice with his pistol. He fired the first shot, and just as he fired the last shot defendant raised his gun and fired at him. That deceased shot at him twice before he shot at deceased. That the last two shots came almost together. That he did not shoot or try to shoot him until he shot at witness (defendant). That the gun he had was a single-barrel, breech-loading shotgun. That it does not break as breech-loading guns ordinarily do, but has a section cut out long enough to admit a cartridge at the back end of the gun. That he did not break the gun after the shooting was over, and did not reload it, or attempt to do so. That he had no other cartridge with him. That he did not attempt to take the shell out after he shot Jim Rogers. That the shell was loaded with No. 6 shot. That when he shot at Rogers his horse started on south, in the direction of home. He saw him fall off of his horse a short distance from that place. That he did not follow him any further. That when the shooting was over he saw his wife coming within a few steps of him. D. C. Rogers took the pistol out of his son's hand after he fell off of his horse, and ordered defendant to leave. That defendant asked him how could he leave when he was between him and his home with a pistol. After that, defendant and his wife left, and went through the woods home. That he went thence to Fort Worth and voluntarily surrendered to the sheriff. Appellant's wife testified substantially as did her husband: That she and defendant started to Eph Williams', and shortly before they met D. C. and Jim Rogers, her husband stepped in the bushes to answer a call of nature, and that she proceeded on towards Williams', and down to the place where the path turned out she met the Rogerses. That when she met them the old man was riding in front, and Jim in the rear, and she noticed that Jim had a pistol lying on the meal sack in front of him. She knew that there was bad blood existing between the Rogerses and her husband, and she was afraid there would be trouble, and she immediately turned back to follow them. That she was present and saw and heard what took place at the homicide. That she saw D. C. Rogers ride in front of her husband, get down off his horse, and tell Jim to shoot defendant. He said: "Shoot him, son. This is as good a chance as you will ever have." That Jim shot at her husband twice before her husband shot at him, and just as he fired the second shot her husband shot at him. When her husband fired at Jim, his horse started south, and after going some distance Jim fell off. She then walked up to where her husband was. He had not moved, but was standing about the same place he was when he fired the gun. Her husband made no attempt to reload his gun after he shot Jim Rogers. He had no other cartridges with him. Besides this testimony, the State offered the evidence of other witnesses living in the vicinity, who testified that they heard three shots; the loud shot came first, which was evidently fired from a shotgun, and then two smaller shots, close together.

The defendant, on his part, introduced witnesses who testified that they heard the shots; and two smaller shots, as if fired from a pistol,

came first, and one loud shot afterwards. Defendant also introduced evidence to the effect that D. C. Rogers on one occasion, several months before the homicide, had an altercation with defendant at the house where they were living; that defendant and his wife had quarreled, and defendant threatened to whip her; that D. C. Rogers interfered, and told him he should not whip or touch her, and, if he did, he would kill him. That thereupon appellant gently struck his wife on the cheek. Rogers got his gun, and Mrs. Yates, who was there at the time, interfered and prevented him from shooting appellant. That D. C. Rogers then stated he would kill defendant, or have him killed, if it was the last act of his life. This incident was admitted by Rogers in his testimony, but he denied that he made any threats to kill appellant, or have him killed. The testimony shows that subsequently they lived together, and evidently peacefully, up to within a short time of the homicide.

The theory of the case for the State, arising from the evidence, is to the effect that appellant, on account of some trivial matters, entertained a grudge against deceased, and that he waylaid and killed him, and that the homicide was murder in the first degree, or at least murder in the second degree. The theory of appellant was that he was engaged in a peaceful mission, in going from his home to Eph Williams' on the evening in question, and that on the road he was assaulted by D. C. Rogers and his son, Jim Rogers; that the latter was about to shoot him, and he slew him in self-defense. Appellant also insisted that manslaughter was in the case.

There are thirty-one bills of exception in this record, a great number of which are upon absolutely trivial matters, that have no important bearing on the case. Such a mass of exceptions upon absolutely unessential matters can serve no useful purpose, and only tend to becloud and confuse questions that are really essential, and to consume the time, not only of the lower court, but of this court, in an examination thereof. We again call attention to this character of practice.

The bill of exceptions reserved to the overruling of the motion for a continuance is not presented in such shape as requires any notice at our hands.

Appellant objected to the testimony of Callie Williams, that one morning, a short time before the homicide, she saw appellant, with a gun, coming down to her house, hallooing and calling out, "Is Jim Rogers there?" That when he came up her husband asked him if he was going to kill Jim Rogers, and he said, "No," but he was going to give him a "damn good whipping." That about that time she went through the house and saw Jim Rogers running from the house towards the brush as fast as he could. That when she saw him, from where he was, he could not have seen defendant at her house. It occurs to us that there is enough in this testimony to show that Jim Rogers was then fleeing from defendant. There was occasion for him to flee, and he must have either seen or heard him; that is, the testimony indicates one or both these cir-

cumstances. Testimony of this character, showing fear or apprehension on the part of Rogers, would tend to show that he was in fear of defendant, and that in the difficulty in which he was killed he was not likely to have been the aggressor, and thus in some measure to have supported the State's theory; that is, it might be used for this purpose, and as such we think the testimony was admissible.

When D. C. Rogers was on the stand the State was permitted to show by him that at the time of the killing in question he owned over 400 acres of land, and had made no will disposing of his property at that time. This testimony was admitted over appellant's objection on the ground that it was immaterial and irrelevant to any issue in the case, and it was not shown that defendant knew of such facts, and same was not binding on him. The defendant, on cross-examination, proposed to prove by said witness that since the homicide D. C. Rogers had made a will, in which he had cut out the wife of the defendant entirely, and had given all of his property to his daughter. The objection to this testimony on the part of the State was sustained. And by another bill of exceptions it is shown that appellant offered to prove by the witness D. C. Rogers that since the homicide he had made a will in which he had cut off from inheritance his granddaughter, the wife of appellant. An objection to this testimony by the State was sustained. Appellant insisted that it was admissible for the purpose of showing said witness' animus, ill feeling, and hatred towards the defendant extending even to those depending on him. While it is true that D. C. Rogers was an important witness for the State, and any testimony tending to support him, on the one hand, or discredit him, on the other, would ordinarily be admissible, it occurs to us that this testimony introduced on the part of the State, to the effect that prior to the homicide he had made no will, was too remote. We are aware that the record shows that appellant insisted prior to the homicide that said D. C. Rogers entertained ill feeling against him and his wife, and had threatened him, and he introduced some testimony to this effect. And doubtless the State took the position that this character of testimony was admissible for the purpose of showing that he in fact entertained no ill will against his granddaughter, the appellant's wife, because he had not then disinherited her. But, as stated above, we think that this circumstance was too remote to have any meaning, or as shedding any light on this question. But, certainly, after this character of testimony had been admitted for the State, appellant should have had the full benefit of the fact that after the homicide said D. C. Rogers had made a will disinheriting his granddaughter. This was before he testified, and it certainly was an act indicative of his animus at the time.

Appellant proposed to prove by the witnesses John Red, Mary Red, Marion Griffin, and others, that the witness D. C. Rogers was guilty of incest with his daughter, and was guilty of sodomy, and had assaulted the wife of appellant, who was his granddaughter, with intent to rape her. Appellant had already been permitted to prove that, in a difficulty

between said D. C. Rogers and appellant about a month before the homicide, appellant had charged said crimes upon him, and threatened to prosecute him for the same if he did not leave him alone and attend to his own business; and he claimed that he ought to be permitted to prove the truth of these charges, in order to support his theory of defense, to wit, that D. C. Rogers, on account of his said threats, and the truth thereof, entertained hatred and ill will against him, and instigated the deceased to attack him on the occasion of the homicide, and that said testimony would tend to support his said theory of self-defense. In response to this proposition, we would say that appellant may in his own mind have entertained such a theory of self-defense, but we do not believe that such a theory is indicated by the evidence. It is very remarkable, if appellant had any apprehension of an attack on him by D. C. Rogers after said threats, about a month previous, that he continued to live with him, evidently on terms of amity; and, outside of the evidence of appellant and his wife, there is absolutely no evidence suggesting any assault by deceased on appellant instigated by D. C. Rogers. This isolated evidence finds no support. On the contrary, it is against the other testimony in the case. However, appellant had the full benefit of the threat made by himself to prosecute D. C. Rogers on account of said alleged offenses, and we know of no rule of law that would authorize the court to turn aside and go into a trial of these collateral issues; that is, as to whether or not the witness D. C. Rogers was in fact guilty of said offenses. The testimony was not sought to impeach the witness. If this had been the purpose, the defendant would not have been permitted to use against him mere accusations of felonies, unless the accusations had assumed the form of legal charges or complaints. See Ware v. State, 36 Texas Crim. Rep., 597; Brittain v. State, 36 Texas Crim. Rep., 406. This disposes of bills of exception numbers 11, 15, and 16.

Appellant desired to prove by Jeff and Elbert Sanders that defendant, Red, some few weeks prior to the killing, tried to rent land from them, and told them he wanted to get away from the vicinity of D. C. Rogers and the deceased, for fear that he would have trouble with them. These declarations of appellant, in connection with his purpose to rent land, were purely self-serving, and not admissible. If we consult the record, his apprehensions were groundless. He had no cause for apprehension. If anyone should have felt alarmed, it was deceased. He had occasion to so feel alarmed, and the evidence tends to show that he did. But, even if appellant did feel alarmed, his declarations in connection with his desire to rent the land were not admissible in evidence. See Harrell v. State (decided at the present term), ante, p. 204.

Appellant objected to the testimony of Euless in impeachment of Mary Red, the wife of appellant. Mary Red was introduced by appellant, and testified on her examination in chief that she was present at the difficulty, and saw all that occurred. On her cross-examination she was asked if on the next morning, when she met Sheriff Euless, she did

not state to him that she was not present, and did not see the shooting, but that she was north of the place and heard it. She denied this, and we believe that it was competent to contradict her on this point.

Appellant also objected to the impeachment of his wife, Mary Red, by the State's witness Polk Hammond. When she was on the stand she was asked if, subsequent to the homicide (naming the time and place), she did not state to Polk Hammond that the reason her husband did not kill D. C. Rogers, as well as Jim Rogers, was because the shell stuck in the gun. She answered that she did not so state. The State was then permitted to put Polk Hammond on the stand, and proved by him that she did make said statement to him. Appellant objected to this testimony on the ground that she was the defendant's wife, and was then being interrogated concerning matters about which she had not been questioned on her direct examination. The court explains this bill of exceptions by stating that: "The witness Mary Red had testified fully for the defendant as to material matters connected with the killing, claiming that she was present at the time. The evidence mentioned in this bill was offered by the State for the purpose of laying a predicate to impeach the witness, and it was expressly limited to that purpose in the written charge of the court to the jury." By reference to the testimony of the witness Mary Red, it will be seen that she did not testify as to any assault or attempted assault by appellant on D. C. Rogers after he had killed deceased. The testimony on this point was solely by D. C. Rogers. Appellant himself denied it, and his wife was not questioned as to the subsequent assault, either by the State or by the defendant. Notwithstanding her failure to testify in this regard, over appellant's objection the State was permitted to ask her, on cross-examination, if she did not state to Polk Hammond that the reason her husband did not kill D. C. Rogers as well as Jim Rogers was because the shell stuck in the gun. We do not believe that the State would have been permitted, in cross-examination, to have asked her about the subsequent assault on D. C. Rogers, appellant himself not having questioned her about the same; and certainly, not having been questioned at all (either by the State or defendant) in regard to said assault, it was not competent to ask her in cross-examination if she had not made such statement in regard thereto to witness Polk Hammond, and when she denied same it was not competent to impeach her by said witness Hammond. See Jones v. State, 38 Texas Crim. Rep., 87; Gaines v. State, 38 Texas Crim. Rep., 202. Besides this, the question propounded was rather to elicit the opinion of the witness as to the reason which occurred to her why appellant did not kill D. C. Rogers as well as Jim Rogers. See Drake v. State, 29 Texas Crim. App., 266. This disposes of appellant's bills of exception numbers 13 and 22.

Appellant desired to prove by the witness Blackman that deceased had repeated to him slanderous language used by one Newland against the chastity of appellant's wife. Under the circumstances of this case, we do not think that said testimony was admissible. There was no man-

slaughter in the case, nor does it appear that said matter had anything to do with the homicide.

Appellant proved by the witness Sutherland: That he saw D. C. Rogers at his house on the next morning after the killing, and heard him make a statement as to what occurred at that time. That said D. C. Rogers stated in that conversation that he (Rogers) was riding along the road at the place of the killing, and that Jim Rogers was riding just behind him; that he saw Red come out of the bushes with his gun; that "he said to Jim, 'Yonder he comes with his gun. Get ready for him,' or 'Fix for him,' I don't remember which." Whereupon the State, over the objections of the appellant, was permitted to prove by the witness Sutherland that at the same time D. C. Rogers told him all that occurred at the homicide; and it was permitted by the State to prove by said witness Sutherland that D. C. Rogers told all the facts and circumstances concerning said killing, which in the main corresponded with his evidence as produced on the trial of this case. It is not necessary here to recapitulate the testimony as contained in the bill. This was objected to on the part of appellant because he had only sought to impeach the witness Rogers by an isolated statement concerning what occurred at the beginning of the difficulty when they first saw defendant coming out of the bushes, towards them, with his gun, and that it was not competent, in order to sustain the witness, to show what he had stated in regard to other facts in connection with the killing. We think appellant's contention is sound. It is competent to impeach a witness by showing that he made a statement to some one else, different from that testified to by him on the trial, as to some fact or facts in regard to the matter inquired about. When so impeached, it is competent to support such witness by proving that shortly after the occurrence, and before any inducement to falsify his testimony, he had made statements similar to those testified to by him on the trial. But we know of no rule that authorizes the support of a witness by showing that he made statements as to other matters, upon which he was not impeached, corresponding with his testimony on the trial.

Appellant also proposed to prove by Mary Red that she had seen D. C. Rogers in bed with her mother on several occasions. This testimony was not admissible.

Appellant objected to the charge of the court, and also asked a number of special instructions which were refused by the court, and he saved his exceptions to the refusal of the court to give the same. We have examined the charge of the court, and in our opinion, with one exception, it is a very clear exposition of the law, as far as it goes.

In paragraph 19 the court instructed the jury on mutual combat, and provoking the difficulty on the part of the defendant. We do not believe that said charge was called for. As we understand it, mutual combat is where two parties mutually and willingly enter into a combat; as where two parties mutually agree to go out and fight with weapons, and do so. This is not such a case. But, according to the testimony of the

State, it is a case in which appellant, even if it be conceded that he did not waylay deceased, was entirely the aggressor. He attacked deceased with a deadly weapon, and slew him, without provocation, and there is nothing short of murder in the second degree in the case. According to the theory of appellant, he was on a peaceful mission, and, without any provocation on his part, was attacked by deceased at the instigation of his father, and he slew him, entirely in self-defense. A charge presenting these distinct issues as applied to the testimony is all that was required—that is, the evidence makes the case depend entirely on who made the first attack; and the issues are clearcut. The State's witnesses swear one way, and the defendant's the other.

Appellant excepted to the refusal of the court to charge on manslaughter. The exception is in the most general terms, to wit, "Because the court failed and refused to charge on manslaughter." We think a proper bill of exceptions to the failure of the court to charge on a given subject should at least present in the bill the salient features of the evidence relied on, requiring a charge on the given subject. If we concede the bill here is a proper one, it requires of us an examination of the entire record, in order to ascertain the testimony which authorized or required such a charge. We have, however, examined the record in this case carefully, and it does not occur to us that there is any testimony demanding a charge on the subject of manslaughter.

Appellant excepted to paragraph 15 as given by the court, but in our opinion said charge was a proper charge, and pertinent to an issue in the case. Acording to the theory of appellant, the attack made on him by deceased with the pistol was instigated by D. C. Rogers, who was a particeps criminis with deceased; and said charge is predicated upon the evidence of appellant and his wife supporting that theory. A similar charge could well be given, eliminating the question of threats altogether, involving the same phase of the case. The special charges requested by appellant we do not believe were called for. Some of them announced correct legal principles, but some, in our opinion, are radically erroneous.

We have given the record a careful and thorough examination, and we reverse the case because of the erroneous admission and rejection of testimony heretofore discussed in this opinion. In the view we take of the case, the testimony of D. C. Rogers was of vital importance to the State, and the defendant was entitled to any legitimate testimony tending to shake or discredit his evidence. Furthermore, the testimony of Mrs. Mary Red was essentially valuable to defendant, and it was incompetent for the State to discredit or impeach her by any illegal testimony. Because, in our opinion, improper testimony was admitted, tending to strengthen and support the State's witness D. C. Rogers, and illegal and incompetent testimony was admitted, tending to impugn and impeach the witness Mary Red, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

HURT, Presiding Judge, absent.