EARL STRINGFELLOW v. THE STATE.

No. 2244. Decided March 20, 1901.

1. **Evidence—Impeachment of Witness by Stenographer's Notes Taken at Former Trial.**

On a second trial for murder, where several witnesses had materially changed their testimony as given on the first trial, it was competent to impeach them with the stenographer's notes of their testimony taken on the first trial, where the stenographer swore that the said testimony taken by him was correctly taken and was exactly what the witnesses had stated in their testimony at said former trial, notwithstanding he also swore that he could not, even after being permitted to refresh his memory from said notes, reproduce the testimony from memory. Henderson, J., dissenting.

2. **Murder—Evidence—Mutual Combat.**

See opinion for facts stated in the evidence upon a trial for murder, which the court hold did not raise the issue of mutual combat. Henderson, J., dissenting.

**3. Same—Charge of Court.**

On a trial for murder, if the evidence raises the issue of mutual combat, the court, in submitting the law upon such issue, should instruct the jury, in effect, that if there was a challenge and acceptance of the same to engage in an ordinary encounter, without any intent to kill, a killing, if a killing occurred, could not be a greater offense than manslaughter, but if the combat was entered into for the purpose of killing, the killing might be murder.

**4. New Trial—Disqualified Juror.**

Where a juror who sat upon the case had sworn on his voir dire that he was not related by consanguinity or affinity to the deceased, and on motion for new trial it was proved that he and deceased had married first cousins and that though deceased's wife was dead she left two sons who were living and were private prosecutors in the case, Held, the juror was disqualified on account of his relationship by affinity to deceased and his sons and the new trial should have been granted.

APPEAL from the District Court of Caldwell.     Tried below before Hon. H. TEICHMUELLER.

Appeal from a conviction of murder in the second degree; penalty, eight years imprisonment in the penitentiary.

Appellant was charged by the indictment with the murder of John Monkhouse, on the 25th day of September, 1897, by cutting him with a knife.

The salient features of the evidence, showing the circumstances immediately attendant upon the homicide, may be gathered readily from the two opinions below, and no further detailed statement is required. The questions discussed in the opinions need no further illustration from the record.

*A. B. Storey* and *W. M. Walton,* for appellant, filed an able and elaborate brief, which the reporter regrets that he can not reproduce for want of space in this volume.

*D. E. Simmons,* Acting Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at eight years confinement in the penitentiary.

The judgment should be reversed because the witness Pickel was not permitted to testify, as shown by bill of exceptions. On a former trial Pickel took down the testimony as a sworn stenographer. On the trial which resulted in this conviction several of the witnesses materially changed their testimony. In order to contradict them the predicate was laid as to their former testimony. Pickel was introduced for the purpose of impeachment. Being questioned with regard to the testimony of said witnesses, he was unable to reproduce their testimony from memory. He was permitted to refresh his memory from his stenographic notes, and

stated that in taking down the testimony he did not charge his memory with it, his sole object and purpose being to get it correctly in his notes; that his mind was directed to that matter and not to recollecting what the testimony was; and could not therefore, after reading the notes, be sufficiently definite in his recollection to reproduce said testimony. He testified, however, that he took the testimony correctly, and these notes showed exactly what the witnesses did testify, and to this he would swear. In other words, he was willing to swear and would have sworn, if permitted, that the testimony taken by him was correctly taken and exactly what the witnesses stated. Under this predicate appellant proposed to introduce the stenographic notes in contradiction of said witnesses. This being refused, appellant excepted. While the question is not so presented perhaps as to require a reversal upon the proposition, for want of a sufficient bill, still the question is before us, and as the case will be reversed upon other grounds, we deem it not improper to call the trial court's attention to the matter. As presented this evidence should have been admitted. Kimbrough's case, 28 Texas Crim. App., 367; Jones on Evidence, for collation of authorities.

Exception was reserved to the action of the court submitting the issue of mutual combat. We are of opinion that this issue was not suggested by the testimony. A brief statement of the substance of the evidence bearing immediately upon this question will show that appellant and a friend in the restaurant were discussing a Mr. Early, an uncle of appellant. Some remark had been made about Mr. Early that was distasteful to the deceased, whose presence was unknown to appellant at the time the remark was made. Deceased immediately became insulting in language and conduct to appellant on account of said remark, and matters looked as if there would be a personal encounter. Friends interfered. Appellant resumed his seat at the lunch counter, and deceased was carried away by a friend. He was gone a short time, when he reappeared in front of the restaurant. Appellant was still seated at the lunch counter. Deceased remarked to appellant that he would not or could not come out there and repeat what he had previously stated. What the prior language was is left in considerable doubt and confusion, if in fact it was known to the witnesses. Appellant went to the sidewalk and a quarrel ensued. Exactly what was said is left in serious confusion, though there was quite a crowd standing about. The State's theory was that, when deceased suggested to appellant to come upon the sidewalk, that he (appellant) immediately drew a knife from his pocket, opened it as he approached deceased, and immediately began a furious assault upon him; that deceased was standing with his hands by his sides, having done nothing, nor offered any resistance. This is the substance of the State's case. Defendant's theory was that when he went upon the sidewalk words ensued, which he did not recollect; that deceased finally remarked

that "Early was a better man than appellant or his God-damn father," whereupon appellant replied that "he was a damn liar." Deceased then, with his left hand, struck or pushed appellant backward, so that he partially fell; and, as he straightened up, deceased struck him on the head one or more blows with a very heavy walking stick. The effect of one of the licks was to raise a knot on appellant's head, as the witnesses say, about the size of a hen's egg. The inference from the testimony, if not a direct statement, was that the deceased was so close to appellant that he could not strike him with the stick without pushing him back, and this was the reason for using his left hand in so doing; that, immediately after deceased struck appellant the second blow with the stick, appellant succeeded in opening his knife, and the death grapple ensued. The parties closed, and, as the witnesses term it, "were clinched and fighting," appellant striking with the knife whenever and wherever the opportunity offered. The physician testified the wounds were not of such serious nature as necessarily would cause death, in fact, that death was the result of the nervous shock rather than the wounds. This evidence does not raise the issue of mutual combat. Roseborough v. State, 21 Texas Crim. App., 672; Kelly v. State, 27 Texas Crim. App., 562; Walton v. State, 34 Texas Crim. Rep., 92; Maines v. State, 35.Texas Crim. Rep., 113; Red v. State, 39 Texas Crim. Rep., 414; Schaner v. State, 1 Texas Court Reporter, 387. But, suppose we are wrong in this proposition, then the exception of appellant was well taken, to the effect, that, having charged upon mutual combat, the court should have gone further and applied the rules of mutual combat to the facts in evidence. If this was a challenge, and an acceptance to fight with fists or engage in an ordinary personal encounter, without intending to kill, the offense could not be greater than manslaughter. If the combat was entered into for the purpose of killing, it might be murder, and the jury should have been informed in regard to this phase of the law. The charge on mutual combat is a limitation upon the right of self-defense, and the charge as given left the jury to grope its way in darkness as to the attitude of appellant under this phase of the charge.

One of the grounds of the motion for new trial challenges the competency of Hanks, one of the jurors who tried the cause. It is made to appear, without contradiction, that Hanks and deceased married first cousins; that the wife of deceased died some years prior to the trial, leaving two sons as the issue of that marriage. These sons were private prosecutors on the trial. Appellant was ignorant of this relationship until after conviction. The juror answered on his voir dire that he was not related to deceased by consanguinity or affinity within the prohibited degree. Except for the issue resultant of the marriage between deceased and his wife, the death of said wife would have terminated the relationship. Under the authorities, it seems that by reason of the issue of the

marriage the relationship is extended beyond the death of the spouse. Under the law, as it is understood in this State, Hanks and deceased, by reason of their wives being first cousins, were related by affinity. Page v. State, 22 Texas Crim. App., 557; Powers v. State, 27 Texas Crim. App., 700. See, also, Foot v. Morgan, 1 Hill, 654; Dearmond v. Dearmond, 10 Ind., 191; Kelly v. Neely, 12 Ark., 657, 56 Am. Dec., 289. The contention by the State that the relationship ceased with the death of the wife of the deceased would be well taken in the absence of issue of the marriage; but as applied to this case the insistence is incorrect, because of the birth and surviving of the children of the marriage. The proposition that the relationship exists by reason of the issue is supported by the weight of authority. Jaques v. Commonwealth, 10 Grat., 690; Bigelow v. Sprague, 140 Mass., 425; 5 N. E. Rep., 144; 1 Am. and Eng. Enc. of Law, new ed., pp. 912, 913; 17 Am. and Eng. Enc. of Law, new ed., p. 1125. Thus it will be seen that deceased, Monkhouse, was related to the juror Hanks within the prohibited degree. So the juror Hanks was also related to George and William Monkhouse, sons of deceased by the first wife. Not only so, but they were private prosecutors; and the grounds of challenge existed as to the juror Hanks and a new trial should have been granted on this account.

It is not necessary to discuss the application for continuance, as it may not arise upon another trial, and if it does it will come under different circumstances. For the reasons indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

HENDERSON, Judge (dissenting).—While I agree with the presiding judge in the disposition of the case, yet I do not agree with him upon two propositions. The opinion authorizes the introduction of the notes of the stenographer taken at a former trial of the case as evidence to corroborate a witness on the trial who had also testified in the former trial of the case. As I understand, this would place the notes of a stenographer on the same plane as examining trial evidence. No authority is cited, except Kimbrough's case, 28 Texas Criminal Appeals, 367, and cases cited in Jones on Evidence. Kimbrough's case goes to the extent of holding the appeal bond taken before the magistrate and the complaint showed that the owner of the stolen property was named S. W. Dodd, and these proceedings were before the grand jury. This evidence was offered on behalf of defendant to show that by the use of reasonable diligence the name of the owner of the property could have been ascertained by the grand jury, and that therefore the prosecution could not be maintained against him for stealing the property of one Dodd whose Christian name was to the grand jury unknown. It was merely held by the court in this case that the papers could be resorted to, at the instance

of appellant, to show that the initials of Dodd could have been known to the grand jury, and that the papers in question furnished the grand jury with evidence to that effect. The court says the purpose of this evidence was to furnish the grand jury such information as came to the knowledge of the examining court. 1 Greenleaf on Evidence, section 437, is referred to in support of the court's definition. I do not think that either the case cited or Mr. Greenleaf sustains the proposition here contended for. In connection with what is quoted in the opinion, I quote also the balance of the section. Mr. Greenleaf says: "Where the witness recollects having seen the writing before, and, though he has now no independent recollection of the facts mentioned in it, yet he remembers that at the time he saw it he knew the contents to be correct. In this case the writing itself must be produced in court, in order that the party may cross-examine—not that such writing is thereby made evidence of itself, but that the other party may have the benefit of the witness refreshing his memory by every opportunity." So it appears that Mr. Greenleaf is only authority to the extent of holding that the paper could be introduced to refresh the witness' recollection. As stated before, if it be conceded that the examining trial papers could be used as evidence it by no means follows that stenographer's notes can be used as evidence. Article 14, Code of Criminal Procedure, authorizes the use of examining trial evidence where the deposition is taken before an examining court or a jury of inquest, and reduced to writing, and certified according to law in cases where the defendant was present when such testimony was taken, and had the privilege of a cross-examination. And it also authorizes the use of depositions on behalf of defendant. Arts. 797, 798, Code Crim. Proc. But there is no statute, civil or criminal, which authorizes the use of a stenographer's notes. Articles 1295 and 1296, Revised Civil Statutes, authorize the appointment of a stenographer or other competent person for the purpose of preserving a statement of the evidence, on the application of either party. But this would seem to have application exclusively to civil cases, inasmuch as the succeeding article authorizes the compensation of the stenographer to be taxed up in the bill of costs. As far as I am advised, there is no provision making him an officer of the court, even in a civil case. In a criminal case, it has been held that a stenographer's report of the testimony can not constitute a statement of facts. Butler v. State, 33 Texas Crim. Rep., 232; Emmons v. State, 34 Texas Crim. Rep., 98. The reference in the opinion to authorities cited in Jones on Evidence, volume 2, section 346, as far as I have examined them, also fails to sustain the opinion. Round v. State, 57 Wis., 45; People v. Chung Ah Chue, 57 Cal., 567; Lipscomb v. Lyons, 19 Neb., 511. Each of these authorities, under conditions similar to those pervading our law on the subject, uphold the proposition that the notes of the stenographer can not be used as original testimony in a case, but can only be referred to

in order to refresh the witness' memory. And I take it there is no distinction between the use of such evidence to contradict a witness and the use of it as original testimony for any other purpose. Until the Legislature shall see fit to create a court stenographer and make his notes testimony in the case, I can see no difference between such stenographic notes and memorandum taken down by any other witness; and, until the Legislature shall act in the matter I am unwilling to judicially legislate on the subject and raise such notes to the same plane as examining trial evidence. I also do not agree with the view taken by the presiding judge, that the action of the trial court in submitting the issue of mutual combat was error. Mutual combat, as I understand it, does not depend alone on a formal agreement to fight, but, if there is testimony in the case tending to show that appellant voluntarily entered into the conflict, and fought willingly, and not in his necessary, or apparently necessary, self-defense, under such circumstances the court is authorized to give a charge on mutual combat. It occurs to me, that a reference to the following witnesses for the defendant presents the issue and justified the court in giving a proper charge on the subject, to wit: Paul Jolly, transcript, pages 93 and 94; McDowell, transcript, page 85; Jackson, transcript, page 98; Earl Stringfellow, transcript, pages 187 and 188. I quote from McDowell's testimony as follows: "There was a good deal of talk back and forth, word for word, you might say. Well, the final outcome of it was Mr. Stringfellow said 'Mr. Early is a God-damn son of a bitch, and anybody that says he isn't is one, too,' or something of that kind; anyhow, Mr. Monkhouse invited him out. Earl Stringfellow came out, walked right up close to Monkhouse and repeated the language, and Mr. Monkhouse struck him on the head as well as I could see." Jackson says, "I saw Stringfellow when he came out of the restaurant. He walked up to Mr. Monkhouse and asked him if he was taking up John Early's fight. I did not understand Monkhouse's reply. Whatever it was, Stringfellow replied to it that it was a lie or 'you are a liar;' then Monkhouse hit him with his fist, somewhere about the throat. The blow knocked Stringfellow down in a sitting position, a little bit sideways," etc. I do not quote from other portions of this testimony which shows there had been a previous altercation between the parties in the restaurant where appellant was. Deceased, Monkhouse, left and was gone a short time, and came back and stood on the gallery where the fight occurred and the homicide was committed. Now, appellant, Stringfellow, in his testimony (transcript, page 107) states that when he came back he stopped on the gallery and said, "Come out here, God damn you, and say what you said a while ago," and he gathered up a pack of cards he had in his hand and put them in his pocket, and went out on to the sidewalk. And again, on page 108, he says: "I went up close to him. I do not remember who spoke first after I got out there. I said something to him about taking up John Early's row. Mr. Monkhouse had said something before this, but I don't remember what it was;

it was something about John Early being as good or a better man than me or my God-damn father. Mr. Monkhouse went on to say that he could whip anybody that don't like John Early. I made some reply to this, though I don't remember the words, and he at once struck me in the neck," etc. On cross-examination this same witness says (on page 111): "My reason for going out was, I suppose, that he dared me out there, and I just went out there like any fool boy would." And that the only reason he had for going out there was that deceased had dared him out there, that he knew of. Now, if these facts do not constitute mutual combat, then it occurs to me that nothing short of a formal agreement to fight, as a duel, would be mutual combat. Appellant's own evidence shows that being dared he went to meet his adversary, went close up to him, repeated what he had said before, called deceased a liar, and when struck by deceased, engaged in the fight. This is appellant's own version. Of course, if we look to the evidence on the part of the State, there is no self-defense in the case; and from that point of view the charge on self-defense coupled with mutual combat would not injure appellant. I believe the court was justified in giving a proper charge on the subject of mutual combat.