## B. M. ANTHONY v. THE STATE.

### No. 668. Decided June 15, 1910.

### Rehearing Denied May 10, 1911.

**1.—Murder—Mutual Combat—Manslaughter—Charge of Court.**

Where, upon trial of murder, defendant was convicted of manslaughter, and the evidence showed that the defendant and deceased in leaving the latter's place had no other purpose than to fight; that they had agreed to fight and were quarreling as they walked down the road together; that defendant was armed with a deadly weapon, etc., this raised the issue of mutual combat and the court did not err to charge thereon.

**2.—Same—Charge of Court—Mutual Combat—Manslaughter—Self-Defense.**

Where, upon trial of murder, the defense evidence raised the issue that it was defendant's intention to have a fist fight with the deceased and not to use a knife, but that when they reached the place where they were to fight deceased

struck him with a large stick which rendered defendant's mind incapable of cool reflection and he killed deceased with the knife, the court properly charged that such killing was manslaughter and not self-defense. Davidson, Presiding Judge, dissenting.

**3.—Same—Case Stated.**

Where, upon trial of murder, the evidence showed that defendant and deceased agreed to fight, and that in pursuance of such agreement the parties left the place where it was made and went to a more private place where the fight could be had without interference or interruption, this was in law a part of the mutual combat, and the mere fact that after they had reached the place of combat deceased struck defendant with a large stick, did not justify the defendant in killing deceased, and the homicide would be manslaughter. Davidson, Presiding Judge, dissenting.

**4.—Same—Abandonment of Agreement to Fight—Self-Defense.**

Where, upon trial of murder, the charge of the court accurately followed the testimony given by the defendant as a witness in submitting the issue of defendant's abandonment of mutual combat, to the effect that if the jury found that defendant had decided to abandon mutual combat and so stated to the deceased, and in starting to leave, deceased struck him with a large stick when defendant killed him, defendant's right of self-defense would be perfect, there was no error, although ordinarily it was not essential that deceased should have been notified of defendant's intention.

**5.—Same—Charge of Court—Manslaughter—Conjunctive—Harmless Error.**

Although it was not correct, in submitting a charge on manslaughter, to use the conjunctive instead of the disjunctive in instructing the jury that an assault and battery by deceased upon defendant causing pain and bloodshed was adequate cause, etc., the error was harmless, as defendant was convicted of manslaughter.

**6.—Same—Charge of Court—Self-Defense.** ·

Where, upon trial of murder, the court's charge on self-defense, taken as a whole, was a correct application of the law to the facts, there was no error.

Appeal from the District Court of Erath. Tried below before the Hon. W. J. Oxford.

Appeal from a conviction of manslaughter; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Martin & Johnson* and *Crawford, Muse & Allen,* for appellant.— On question of the court's charge on mutual combat directing a conviction of manslaughter: Williams v. State, 25 Texas Crim. App., 216; Foreman v. State, 33 Texas Crim. Rep., 272; Pruitt v. State, 30 Texas Crim. App., 156; Carter v. State, 37 Texas Crim. Rep., 403; Barton v. State, 23 S. E. Rep., 827, and cases cited in the opinion.

*C. E. Lane,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—This appeal is prosecuted from a conviction had in the District Court of Erath County on January 31 of this year, finding appellant guilty of the offense of manslaughter and assessing his punishment at confinement in the penitentiary for a period of five years.

The record presents a number of questions of great difficulty, and in order to make the opinion understood it will be necessary to make a somewhat detailed statement of the issues arising on the trial and to state some of the evidence in relation thereto. Appellant and Robert L. Snider were neighbors, both farmers, and lived not far apart in Erath County. The deceased was a somewhat younger man than appellant, and a very stout, athletic man, weighing some 175 pounds. Appellant was about forty-six years of age, weighed about 135 pounds, and was somewhat disabled in his left hand, and was not nearly so stout as deceased. The evidence indicates there had been some unpleasantness between the parties prior to the day of the fatal meeting, which was of such a character that had not wholly interrupted their intercourse with each other. From the record it appears that on the morning in question appellant passed by the house of deceased going to the house of one Sanders with the intention of going with Sanders to Stephenville, and the evidence showed that the road from appellant's residence to Sanders' house went by the home of deceased. The road running by appellant's place was in a general east and west direction, deceased's house being on the south side of the road. Arriving there about 8 o'clock in the morning, it appears by the testimony of Calvin Snider, a son of deceased, that appellant spoke to him and told him to tell his father to keep his calves out of his field, and that if he did not there was going to be serious trouble, and that he then asked if deceased was at home, and being answered that he was and whether he wanted to see him, he said he did, and to tell him to come out. Young Snider says he told his father that appellant wanted to see him, and that his father walked out to the gate with a cotton picking sack in his hand, and that the parties stood there and talked; that after they had talked for some little time appellant said to deceased: "Are you ready," and that his father said, yes, and that they then walked down the road side by side. He also says when appellant first came to the house he had open a large knife in his hand, and that he had this knife in his hand open as he and his father walked off down the road towards the west. He saw them no more until after the killing. Mrs. Snider was introduced, who testified that a short time after appellant and her husband left the gate, that she stepped out into the front yard, and just as she got out she saw her husband fall or sink down in the road, and at the time saw appellant break and run and call a man who was in front of him, but at the time she thought nothing of the incident. Lee Riley testified that he saw the parties on the morning in question standing at the gate, and that when he got within fifty yards of them they both started off walking west down the road. That just about the time they left the gate he saw appellant put his hand in his pocket and get out his knife, and hold it in his hand as he walked along, appellant on the right and Snider on the left; that appellant's hand, in which he carried the knife, was down in

the usual manner of carrying one's arm, but a little out from his coat, and, as it seemed to him, a little to the back. He says he overtook these men about 100 yards west of Snider's house, and they turned out of the road a little, and about the time he got to them his mules got scared at something and by the time he got them stopped he had passed the men a little, and at this time appellant was next to the wagon and deceased slightly in front of him; that as he stopped he asked them what the trouble was, when deceased replied that appellant was just blowing around, and then said if he would put up his knife he would show him how quick it was done. That he told them there was no use to have any trouble, and drove on a distance of about 100 yards when he heard someone holloing, and looked back and saw appellant coming up the road. That when appellant came up he said he wanted him and Kerr, a neighbor, to go down and see about deceased; that he drove over to the fence and hitched his team, and appellant said to him: "You keep your head; I will want to use you for a witness." In the conversation this witness says that appellant told him that he had hurt Snider after Snider had hit him with a club, but that he did not know how bad he had hurt him; that he had tried to hurt him, and for them to go and see. He also says as he passed these men they were standing on the side of the road, appellant being nearest the wagon and facing south, and still having a knife in his hand holding it back behind him in what he would call a striking position, and that they were standing close enough to touch each other, deceased facing north and appellant facing south, and that deceased had nothing in his hand when he saw them. That right at their feet, but whether just between them or little to one side he did not remember, there was a pretty good size stick some three and one-half or four feet in length. He testified when appellant came up that there was blood on his face and clothes, and that his hat was torn on the crown and brim. He also testified that when he went to where deceased was he saw lying some twenty feet from where the two men were standing when he passed them in the road, the large stick which he had mentioned before lying in the middle of the road not far from Snider's body. It also appeared there was a smaller stick lying on and rather between Snider's legs. It was shown by other witnesses that this stick had been somewhat burned and had dirt and trash on it, and there was no evidence of any dirt or anything else being on deceased's hands. In a general way, and as far, as in view of his absence, could be expected, Anthony Keer corroborates the witness last named. The knife referred to was shown to have been a one-bladed knife with a blade about four inches long, and the point of the blade, the evidence tends to show, was broken during the difficulty, leaving the remaining part of the blade about three inches in length and about three quarters of an inch in width. It was shown more specifically by the testimony of Bates Cox that the small stick lying between deceased's

legs had been burned and charred at one end and that the small end of the stick was near what is called the crotch of deceased's trousers. He says he examined the hands of deceased carefully and there was no smut on them like that on the burned stick. The evidence showed that there were four wounds on the body of deceased, two in the chest, one in the abdomen, and one in the small of the back. The two in the breast were superficial and did not extend into the cavity, and were not serious. The wound in the small of the back was a stab wound about half an inch to the right of the middle line of the back, and about two inches deep, extending to and striking the body of the spinal column. The wound in the abdomen was just above the navel about an inch and in direct line with it, and was the fatal wound. J. D. Biggs was introduced by the State, who testified that he had a conversation on the morning of the killing about 9 o'clock with appellant, and that appellant asked him out to one side of the house and talked to him privately in regard to his knife. He stated the knife he had was a large one, and that some of his friends or neighbors thought that he had better turn in the smaller knife to the officers when they came, and asked him what he thought about it. He says he told him he would turn in the knife he had, and that appellant said in substance that that had been his own view of the matter. This witness makes the following statement as to what appellant said touching the facts leading up to the difficulty:

"That he was going to town that morning, and in doing so went by Snider's house; that Snider's calves had been bothering him, and that when he got even with Snider's house he saw Snider's boy in front of the house, and told the boy to tell his father that he wanted him to keep his calves out of his cotton. He said the boy told him his father was in the house and asked if he, defendant, wanted to see him, and that he told the boy he did; that Snider then came out, and that he then told Snider to keep the calves out of his field, and that then Snider seemed to get mad and said that he, Snider, could whip him. He said that he told Snider then that if he would go away from the house, or down the road, he did not think he could do it, or that if he would go away from the house he did not think he could whip him. They then went on down the road, he said, and there Snider knocked him down with a club before he got his knife out of his pocket, and then said he had to do what he did. This is as near as I can repeat what defendant told me in regard to the difficulty between himself and the deceased."

On cross-examination he makes the statement in reference to the agreement to fight rather stronger. This statement is as follows:

"Defendant repeated to me his conversation with Snider out at the latter's gate. I do not recall that he said to me that Snider said, 'Damn you, I can whip you.' He did, however, state that Snider said

he could whip him, and that he then told Snider that if he, Snider, thought he could to come on away from the house. He stated that he and Snider then went on down the road together. I do not recall that defendant stated anything about Snider picking up a stick, but he stated merely that Snider struck him with a stick, or hit him with a stick, and knocked him down before he got his knife out. Defendant did not go into detail as to the manner and character of the difficulty, further than I have stated the substance of the conversation."

Rube Bass, introduced by the State, testified that he was at the home of appellant about 10 or 11 o'clock on the day Snider was killed. He makes this statement:

"At this time and place the defendant spoke of the killing of Snider and said that he, defendant, was coming along the road to his neighbor, Sanders, for the purpose of coming to Stephenville, and that in doing so he had to come by the house of R. L. Snider, and there stopped and told Snider to keep his calves out of his field; that Snider said he would come out there and whip him. Defendant said that he told Snider he would have to go down the road, and that they then walked off together; that they had quarreled some about the trouble, but that it had stopped and they were talking in a business way, and that he, defendant, was thinking of going along, and that then Snider picked up a pole and struck him and knocked him down twice. He said that he knocked him down twice, and that he got up on the inside of Keer's field, and that he had knocked him down before he ever got his knife out."

On cross-examination he also seems rather to emphasize the matter of the agreement to fight. The statement on cross-examination is in this language:

"In the conversation referred to defendant said that in passing Snider's house he stopped to tell him about the calves in his field; that when he did so Snider got mad, and said that he would come out there and whip him; that he, defendant, told Snider that he would not do it there at the house, but would have to go down the road, and that Snider came out of the gate and they both then walked on down the road, and that as they went they quarreled, but finally quit and got to talking business. I do not recall that defendant said anything about having his knife, except to say that Snider knocked him down twice before he ever got his knife. He also said that after he was struck it seemed to addle him, and that he could not tell the particulars of it, and that about the first thing he knew he was in Kerr's field."

In this connection the following statement was made by appellant on cross-examination touching his conversation with deceased at the house:

"When I got to the gate I spoke first to the boy, Calvin Snider, and told him to tell his father to yoke the calves and keep them out of the cotton. The boy then told me his father was in the house,

and told him to come out. Snider then came out to the gate, and we both said good morning, or howdy, I don't remember which, and then I told him I wanted him to yoke his calves. He said all right, and I then told him to be certain to do it and not let them get into the other piece of cotton. I did not speak angrily any more than I am now. When I told deceased to be certain to yoke the calves I meant that I did not want him to neglect doing so. He then said: 'Damn you, I can whip you.' To this I replied that he was a preacher and ought not to curse. Q. And then you told him he could not do it if he would go away from the house? A. No, sir, I told him— let me see how I did tell him—it was something about going on down the road. Q. You suggested to him to go away from the gate? A. I think I told him to come on down the road. Q. You invited him down the road with you? A. Certainly. Q. That was in response to his declaration that he could whip you? I mean that was after he had said that he could whip you? A. Yes, sir; I didn't want any trouble with him. I told him to come on down the road, yes, sir. Q. You meant what you said? A. I don't know that I did; I thought we were good friends. Q. You invited him off down there to have a fight? A. I don't know about that; from the way he talked I thought he was going to lick me.

"I still had the knife in my hand as we were walking along, and I think I was still whittling, and I might have had the knife drawn up at the time Lee Riley passed us in the road. Why did I do that? He had tried to get that stick of wood and I told him not to do it, but it is not a fact that I was cursing him and making him stand with my knife drawn. I might have been whittling on this post oak stick all up to this time, but do not recall just when I dropped the stick. I had cut it thirty or forty steps after leaving my house and had been whittling on it all the way. The stick was about as large as my finger and some eight or ten inches long."

He also makes the following statement: "We then walked on and came to where that club was in the side of the road, and he stopped and made a little move as though to pick it up, and I told him not to do that. He then said to me: 'If you will put down that knife I will show you how quick this thing is done.' I told him I would not put the knife down, and about that time Lee Riley drove up, and as he did so he wanted to know what the trouble was. Deceased then said: 'Anthony is just blowing off,' or something to that effect, and then said if I would put up my knife he would show me how quick it was done. I told him I would not do that, and that I did not want to hurt him, if he would behave himself. But I did not want him to hit me with that stick."

After Riley had left the parties alone, appellant testifies as follows: "Riley drove on by, going west, and after he had passed I told deceased that if he wanted to do what was right we would not have any trouble. He then asked me what I wanted him to do,

and I told him that I did not want anything except to keep the calves out of the field. He then said he was perfectly willing to do that, and when he told me that I then said to him that I was in a hurry, and turned and shut up my knife and put it in my pocket and started to walk off. As best I recollect, I made a step right to the edge of the road when he struck me with that big stick. He was right up against me at the time. When he struck me this right hand went down on the ground, and the next blow—I don't think I went quite to the ground. I don't know whether I was hit on the back or the breast; I just knew that I was struck again. By the time I got my knife out he was fixing to strike me again, and I dodged down and caught him, and I suppose then is when I stabbed him."

There are numerous details which might be noticed, but the above statement will no doubt be sufficient to illustrate and render easily comprehended what we wish to say:

1. Among other things it is urged that under these facts it was error on the part of the court to charge the law of mutual combat, and it is earnestly insisted by counsel for appellant that mutual combat was not raised by the facts in the case. In support of this contention we are referred to the following authorities: Kelly v. State, 27 Texas Crim. App., 562; Meuley v. State, 26 Texas Crim. App., 274; Everett v. State, 30 Texas Crim. App., 682; Havard v. State, 55 Texas Crim. Rep., 213, 115 S. W. Rep., 1185; Stringfellow v. State, 42 Texas Crim. Rep., 588, 61 S. W. Rep., 719. We have examined carefully all these cases and none of them even by analogy are of much aid in solving this question.

In the Kelly case, supra, the following summary of the facts is made by Judge White, who delivered the opinion: "There was no proposition to or understanding between the parties that they were to fight. On the contrary the proposition and understanding was that they were to wrestle for a sum of money or upon a bet as to which could throw the other down. In preparing for this contest one or the other got mad, drew his knife and assaulted the other with it. The evidence is conflicting as to which party commenced the fight. During the fight both parties were cut with a knife. Under the facts of the case it was error to charge the law of mutual combat." Mutual combat is not discussed. That was a case in which the law of provoking a difficulty arose, and that doctrine is discussed in the case at length, but it seems not to be an authority on the doctrine of mutual combat.

In the case of Everett v. State, supra, the facts are thus stated in the opinion: "In substance, these facts are that the defendant's dogs were baying something in the field back of his house. That defendant got his double-barrel shotgun, which he had loaded with buckshot, as he testified, to defend himself whenever it became necessary to do so, and went to the back of his field to see what his dogs were

after, and finding that it was a polecat, started to return home, and when he had reached a distance of two or three hundred yards of his house he heard screaming there. This screaming was by his wife and children. They testified that the deceased came up to the gate, which, as above stated, is some forty or fifty yards from the front of the house, and inside the pasture. That he called to defendant by name, and told him to come out; that he intended to kill him. They commenced screaming, and the wife begged him to go away and let her husband alone. That he said he intended to kill him if it was the last act of his (deceased's) life, and flourished a pistol. Defendant, hearing the screams, ran up to the house, went around in front, saw the deceased at the gate, begged him to leave, telling him that his wife was almost in a dying condition, and that he was the cause of it. Deceased refused to leave, saying he was on his own premises. Defendant walked up close to the gate, when, he says, deceased ran his hand down toward his pocket, and with the other hand made a motion as though he would grab the gun; that he fired and killed him." Under these facts it was held that there was no evidence upon which to base a charge on mutual combat. But this evidence is so wholly dissimilar to the facts here as not by analogy to be of value.

In the Havard case, 55 Texas Crim. Rep., 213, supra, this statement was made: "Evidence was introduced also of a statement made by deceased, after the cutting, while being carried to the house, that appellant cut him at the gate, and cut him all the way down to where they stopped, and after they ceased running. The testimony of Thompson was to the effect: That when Rufus Cook threw down the singletree and ran, Arthur Shannon pursuing him, deceased, Sweet Cook, took after Arthur, and that appellant then told the deceased to 'Hold on there; there are two of you.' That deceased immediately turned on appellant, and they tussled around a little and hit two or three licks. That the last lick was when appellant hit Sweet Cook in the back. They were close together when appellant inflicted the last cut, which was in the back. The testimony of Tom Thompson, Joe Havard and John Swain discloses the fact that there was blood at the place where the difficulty occurred near the gate; that there was blood spattered on a pine tree near where they fought, and that it was found on the ground, from where the difficulty first occurred, some 280 steps down the road, and about eighty yards further on." Under these facts it was held that the issue of mutual combat did not arise.

The only case which by any analogy could at all be held to even tend, in our opinion, to support appellant's contention, is that of Stringfellow v. State, 42 Texas Crim. Rep., 588, above cited. An inspection of the record will show that opinion was by a divided court, Judge Henderson dissenting on the ground that in his judgment the facts raised the issue of mutual combat. It will also be

observed that in the majority opinion Judge Davidson states certain portions of the testimony, and that Judge Henderson in his dissenting opinion quotes other portions of it at rather greater length than does Judge Davidson. The syllabus fairly well states the facts. It is as follows: "Defendant and another were in a restaurant, discussing defendant's uncle, when deceased, who overheard some remarks, became insulting on account of it. Friends interfered, and deceased was taken away, but shortly reappeared in front of the restaurant and told defendant that he could not come out there and repeat the remarks. Defendant went out, and a quarrel ensued. Deceased finally pushed defendant back and struck him twice with a walking stick, when defendant grappled deceased, striking with a knife whenever opportunity offered. Held, that it was error to submit the issue of mutual combat, since the evidence did not raise such issue." It should be further remarked that in that case it was held that the charge on provoking a difficulty in any event was erroneous, for which the case would have to be reversed. We think if the majority opinion should be held to be correct, and we have no disposition to criticise it, that the testimony in that case is nothing like so strong as the facts shown in the present record. Here the facts all show that the parties in leaving Snider's house had no other purpose than to fight. The statement of Snider was that he would come out and whip him. The reply of appellant was that if he would go away from his house, that he did not think he could whip him. The evidence further shows that the parties were quarreling as they walked down the road together. The evidence is further to the effect that at this time appellant was armed with a deadly knife. It also appears from appellant's testimony that during the time of their quarreling and as a part of their trouble, the deceased had tried to get a stick of wood with which he afterwards, as he claims, struck him and appellant told him not to do it. It would be difficult for the State ever to make out a case of mutual combat if this testimony should be insufficient either by circumstances or by positive testimony. So that we have no doubt upon the whole case, under all the facts, that the issue of mutual combat was in the case, and that the court did not err in submitting this issue to the jury.

2. The next question is, was the charge of the court on this issue, in view of all the circumstances, erroneous? While quite lengthy, it is indispensable to present the matter clearly that we should quote the entire charge of the court on this question. These instructions are embraced in the following paragraphs of the court's charge:

"You are further instructed, gentlemen, that if the defendant voluntarily engaged in a combat with deceased, knowing that it would or might result in the death or such serious bodily injury as might probably produce the death of either himself or the deceased, he can not claim self-defense.

"Now, if you believe from the evidence in this case, beyond a rea-

sonable doubt, that the defendant, B. M. Anthony, met the deceased, R. L. Snider, at the latter's gate, and that a quarrel ensued between them at said place, or that the deceased became angry and told the defendant he could whip him, and that the defendant then invited the deceased to go with him, the defendant, away from deceased's house and gate for the purpose and with the intention on the part of the defendant of engaging in a fight with the deceased, and for the purpose and with the intention on the part of the defendant to use the knife exhibited in evidence before you, in said fight, and that they, the defendant and deceased, for the purpose and with the intention of engaging in a fight with each other, left the yard gate and house of deceased, and walked together a distance of one hundred or from one hundred to two hundred yards, and that after they reached said distance from the yard gate and house of the deceased they ·voluntarily engaged in a combat, and that deceased used the large stick exhibited in evidence, or some other stick, and that the defendant used the knife exhibited in the evidence in said combat; and if you further believe from the evidence in this case, beyond a reasonable doubt, that said stick and said knife, from the manner in which each was used, were deadly weapons, and that when the defendant agreed to engage in said combat (if he did so agree) and did engage in said combat with the deceased under such circumstances, if he did do so, he knew that it would or might result in the death or serious bodily injury as would probably produce the death of either the deceased or himself, the defendant, and that in such combat the defendant did kill the deceased by cutting and stabbing him with the knife exhibited in evidence, then such killing would not be justifiable, no matter who brought on the attack or struck the first blow; but if the defendant's mind was calm and sedate and capable of contemplating the consequences of the act proposed to be done by him at the time he formed the design or agreed to engage in such combat with the deceased, and to use his knife therein, if he did form such design, or agree to engage in such combat, then he would be guilty of murder in the first degree; but if at the time he agreed to engage in such combat with the deceased and formed the design to do so (if he did so agree) the defendant's mind was agitated and disturbed and he was laboring under the influence of passion producing in his mind such a degree of anger, rage, resentment or terror as to render it incapable of cool reflection, but such condition of mind was not aroused by an adequate cause, as that term is hereinbefore defined to you, then said killing would be murder in the second degree. But if at the time the defendant agreed to engage in such combat, if he did do so, he was laboring under the immediate influence of sudden passion, such as anger, rage, sudden resentment or terror, rendering his mind incapable of cool reflection, and such passion was aroused by an adequate cause, as that term is hereinbefore defined, and that under such circum-

stances he engaged in such combat, then said killing would not be of a higher grade of offense than manslaughter.

"Moreover, gentlemen, if the defendant at the yard gate of the deceased, agreed with the deceased to engage in a fight with deceased, and if at the time he intended to have only a fist fight with deceased, and not intend to fight the deceased with a weapon, and did not intend to use a knife on deceased, and if pursuant to such intention, he went with deceased some distance from the yard gate and house of the deceased, and if at the place they stopped, the deceased struck or attacked the defendant with the large stick exhibited in evidence before you, or with any other stick and produced in his mind such a degree of anger, rage, resentment or terror, as to render it incapable of cool reflection, and that under such circumstances defendant killed the deceased by cutting and stabbing him with a knife, he would not be guilty of a higher grade of offense than manslaughter.

"Moreover, gentlemen, if the defendant at the yard gate of the deceased agreed to engage voluntarily in a combat with deceased, either with the knife exhibited in evidence or without it, and with his fists, and if the defendant and the deceased left the yard gate and house of the deceased for the purpose and with the intention of engaging in a combat with each other, but after they had gone some distance from the yard gate and house of the deceased, they stopped, and the defendant decided to abandon the combat and the agreement to have a combat, and so stated to the deceased, and started to turn and leave the deceased, and the deceased then struck or attacked the defendant with the stick exhibited in evidence before you or with any other stick, and in defense of himself against such attack by the deceased, the defendant killed the deceased by cutting and stabbing him with the knife exhibited in evidence, or if you have a reasonable doubt as to whether or not the killing occurred under such circumstances, the defendant would be justified in such killing.

"Moreover, gentlemen, if the defendant did not agree to fight the deceased unless attacked, and if the deceased attacked the defendant with the club or stick exhibited in evidence before you, or either of them, and the defendant killed the deceased in defense of himself against such attack, or if you have a reasonable doubt as to whether or not the killing took place under these circumstances, you will give the defendant the benefit of such doubt and acquit him."

The principal attack is made on the 33d paragraph of the court's charge to the effect, in substance, that if at the time of the agreement to fight it was appellant's intention only to have a fist fight with deceased and not to use his knife, that if in pursuance of such agreement he went with deceased some distance from the yard gate and house of deceased, and if when they stopped the deceased struck or attacked him with a large stick which produced in his mind such a degree of anger, rage, resentment or terror as to render it incapable of cool reflection, and that under such circumstances appellant killed

deceased by cutting and stabbing him with a knife, he would not be guilty of a higher grade of offense than manslaughter. This charge was complained of in the motion for a new trial for the following reasons:

"Because said charge is not the law in this State in any particular, and because if defendant agreed to fight deceased with his fists and went to the scene of the homicide or place where the killing occurred for that purpose, and on arriving there the deceased attacked and struck the defendant with the large stick exhibited in evidence (which was shown to be a deadly weapon), then such act on the part of deceased, before any act was done by either of the parties in pursuance of the agreement to fight a fist fight, showed on the part of the deceased an intention to abandon the agreement to have a fist fight, and to murder the defendant, and if defendant struck the deceased and killed him under such circumstances such killing would be self-defense, inasmuch as the act of the deceased in making such murderous assault was a distinct and independent attack and an assault to murder not contemplated by the parties and not contemplated by the terms of the proposed fist fight, but the same would constitute a specific and independent act disconnected from the former agreement which was only a misdemeanor, such attack or assault by deceased, being an independent felony, and under such circumstances the defendant's act would be self-defense and entirely justifiable."

And this is the question of difficulty in the case. We think that while quite plausible, that appellant's contention is unsound and fallacious. That our views may be understood, it may be well to recur to some of the authorities in this State on this subject. Among the earliest and best considered cases in the reports on the law of mutual combat is the opinion of Judge Hurt in the case of Williams v. State, 25 Texas Crim. App., 216. Discussing the charge there given and as illustrating by examples the law of mutual combat, it is said:

"Upon the subject of mutual combat the learned judge instructed the jury as follows: 'The law does not permit men to engage in mutual combat, and when two or more persons engage willingly in mutual combat, each is responsible for the consequences of his own act.' As law to be applied to the case, or any phase of the case, the above proposition contains no light for the jury. Let us suppose that A and B willingly entered into a combat, neither intending to kill the other, and A inflicts great injury upon B, and is killed by B. Now B would be responsible for the consequence of his own acts, it is true; but of what offense would B be guilty if he kills A under the passion produced by the great injury? The answer to this question would furnish practical information to the jury. Propositions of law may instruct the jury in some instances, but the above proposition, though correct, can not aid the jury in arriving at the offense committed by B.

"If B is the aggressor, produces the difficulty, assaults A, but does

not intend to kill, and A inflicts injury upon B, and B, under the passion aroused by the injury, kills A, he would be guilty of manslaughter. (Art. 597, Penal Code.) Hence, if B and A enter willingly into a combat, without intending to kill, and A inflicts great injury upon B, and B kills A in a passion caused by the injuries, B would be guilty of manslaughter, both being aggressors."

The same doctrine is in substance announced in the case of Foreman v. State, 33 Texas Crim. Rep., 272. Judge Davidson, who wrote the opinion of the court in that case, uses this language: "Deceased proposed to appellant to retire to the 'woods' and settle their grievances. The defendant accompanied him to the designated place, seized a large stick, and with it slew his adversary. The deceased was unarmed, having left his gun at the house. The evidence clearly, discloses that the combat was to have been with arms or weapons. This being the case, self-defense was eliminated from the case, and in view of the fact that the conviction was for manslaughter, with the minimum punishment assessed, we are unable to appreciate any bearing this evidence could have had upon the case favorable to the defendant. Pruitt v. State, 30 Texas Crim. App., 156." Further along in discussing the matter and applying the law of mutual combat to the facts of the case, he says: "Whether such killing is murder in either degree or manslaughter must depend upon the facts attendant upon the case on trial. It is not matter of law in either case. The condition of the mind, in such state of case, is not fixed by law, but must be ascertained from the facts adduced in evidence. Whether the killing occurs in mutual combat or otherwise, the nature, character and degree of such homicide will depend upon the condition of the mind of the slayer; and this must be ascertained from the circumstances of the particular case. This condition of the mind, whether cool or sedate, or inflamed and excited, or aroused to such sudden passion as to render it incapable of cool reflection, induced thereto by an adequate cause, is not to be determined by the law as matter of law, but is to be solved from the facts by the jury. These were general remarks by the court. Following these remarks the court properly applied the law to the facts of the case. Was it possible for the remarks of the court to have injured appellant? That they did not affect the jury is evident, because manslaughter, and not murder, was the offense found, and no honest jury could have acquitted or found less than manslaughter under the circumstances of this case. Self-defense and the law of retreat are not issues in this case under the evidence before us."

Again, in Carter v. State, 37 Texas Crim. Rep., 403, after some reference to the facts, Judge Davidson, speaking for the court, on the instructions which the jury should receive in respect to the second theory, that is, mutual combat, says: "That the defendant entered into a mutual combat—a simple assault and battery—and, being assaulted by his adversary and others with chairs, he resorted to a

deadly weapon. The court should have instructed the jury upon this theory, to wit: a mutual combat without intending to do serious bodily injury, and resorting to deadly weapons when more force was used by his adversary than he originally contemplated. The result of such a state of facts would be manslaughter."

This same rule is also clearly recognized in Stringfellow v. State, supra, where Judge Davidson says: "If this was a challenge and an acceptance to fight with fists or engage in an ordinary personal encounter, without intending to kill, the offense would not be greater than manslaughter."

The evidence in this case raised the issue, as we believe, of mutual combat. It may be true that where there is a mere agreement to fight with the fists followed by no subsequent act in furtherance of such agreement, and thereafter one of the parties to the quarrel assaults his adversary with a deadly weapon, that the party so assaulted would, under the law, be allowed to protect himself and claim his perfect right of self-defense. However that may be, that doctrine can have no application here. In this case the evidence shows or at least justifies the conclusion that there had been an agreement to fight, and that the parties in pursuance of such agreement had left the house and were going to a more private place where the fight could be had without interference or interruption. This the law treats as a part of the combat, recognizing it as an overt act in furtherance and as part of the combat. There must in every case of mutual combat be a beginning of the fight by some one of the persons engaged in it. It would not be claimed in this case that if there was an agreement to fight by the parties, a leaving of the house to fight, that the mere fact that one struck the other before giving notice in words of his intention so to do, that his adversary would be protected under the ordinary rule of self-defense. The fact that if the parties had agreed to fight with deadly weapons with a deliberate and set purpose, and one of them first draws his weapon and fires and either missing or not slaying his adversary, is in turn by him killed, it could not be claimed that the person killing acted in self-defense, but in such case, if the agreement was deliberately made, the offense would be murder in the first degree. And so it would seem under the authorities above cited that if the parties agreed to fight, not with deadly weapons, but one of them subsequently attacks his adversary with such means as that to save his life he must resort himself to the use of a deadly weapon, he does not go acquit, but if there is raised in his mind that degree of terror, rage or resentment, recognized by the law, the offense is manslaughter. The books have not, so far as our examination has discovered, written out at length the reasoning on which this rule is based, but it must be, as we believe, on the theory and proposition that both parties are, when the agreement to fight is made, and when they have done some act or acts in furtherance of such agreement, engaged in a violation of the law, and are culpable

in some degree for any overt act done in furtherance thereof. Again, we think the law must take some account of the fact that even if two persons do agree to fight in a given manner, that either wickedly designing to take some advantage of the adversary or moved by uncontrolled passion, one of them may strike with a deadly weapon, and that in considering their culpability, some knowledge of this fact must be assumed and presumed. So that we believe the charge of the court in respect just considered is not only not objectionable, but is a fair and correct submission of a most difficult question.

Again, special objection is made of so much of the 34th paragraph of the court's charge above quoted as instructs the jury that if after the parties had gone some distance, they stopped, "and the defendant decided to abandon the combat and the agreement to have a combat, *and so stated to the deceased,* and started to turn and leave the deceased, and the deceased then struck or attacked the defendant with the stick," and that in defense of himself against such attack the defendant killed the deceased, or they had a reasonable doubt the killing occurred under such circumstances, that he would be justified. This charge is complained of because if appellant had abandoned the combat or agreement to have a combat, his right of self-defense would be perfect, and he would not be required to notify deceased of such abandonment or to start to turn and leave before his right of self-defense would be perfect. In determining the accuracy of every charge, the court should always do so with reference to the facts of the case, and consider the charge of the court as a whole. As will appear from the statement of the case given above, appellant testified that he told deceased that if he wanted to do what was right there would be no trouble, and deceased then asked him what he wanted to do, and that he told him he wanted nothing except for him to keep his calves out of the field; that deceased said he was perfectly willing to do that, and thereupon appellant said: "When he told me that I then said to·him that I was in a hurry and turned and shut up my knife and put it in my pocket and started to walk off," and that when he made a step to the edge of the road that he struck him with a big stick. It will be noted, therefore, that the charge of the court follows accurately and almost literally the testimony of appellant, and submits the issue of abandonment as stated by him. The charge is to the effect that if the jury should find, not that he had in fact *abandoned* the difficulty, but if he had *decided* to abandon the combat and agreement to have a fight and so stated to deceased and started to turn and leave him, and deceased then struck him, that his right of self-defense would be perfect. We can imagine many cases where this charge would be erroneous. Where there has been in fact an abandonment of a prior agreement of mutual combat, it is not, we think, essential that one's adversary must, at the peril of his life, be notified of such abandonment, but where, as in this case, the evidence of abandonment raises the issue not only of a decision so

to do, of notice of that fact, and of a step taken to leave the presence of such adversary, and the issue is submitted, applying the law directly to the facts of the case, we can not concede that such a charge is error. It would perhaps have been better if the court in this case had instructed the jury that if notwithstanding they believed that there had been an agreement for mutal combat, if appellant had abandoned same, that his right of self-defense would not be impaired. Still we think where the court does submit the very facts of the case to the jury, that it can ñot be said, if error, to be such error as would either justify or require this court to reverse the case. Indeed, it might be claimed with some reason that the jury would better understand and comprehend such charge as was here given than one that abstractly or generally submitted the issue. The case of Welch v. State, 57 Texas Crim. Rep., 111, 122 S. W. Rep., 880, was one which involved the same principle, and the following extract from that case seems appropriate here:

"It will thus be seen that under this instruction, if the jury believed or had a reasonable doubt in their minds that while defendant and deceased were discussing the matter about the purchase of a pistol, appellant took out his money purse, and thereupon deceased grabbed same, or knocked it out of his hands, and thereupon the defendant remonstrating with or asking him (deceased) what he meant, the deceased rushed upon defendant and struck at him with a knife, and appellant immediately ran to his horse, seized his gun and shot and killed Tanner, then in case the jury should so find, or if they had a reasonable doubt that such were the facts, or as to the fact that deceased so attacked defendant with a knife, they would acquit him. This charge applies the very facts relied upon by appellant. It is true, it does not in terms instruct the jury that appellant had the right to kill deceased if he believed that he was attempting to rob him; but it does instruct the jury that if the facts touching said robbery testified to are true, then appellant should go acquitted. It also, in another paragraph, instructs the jury that if deceased had picked up a rock, or defendant believed that he had, and was in the act of making an attack upon him, or if it so appeared to him at the time, and he shot deceased, he should be acquitted. This, we think, was quite as favorable a charge to appellant as he was entitled to receive under the law. The issue in fact of the robbery was based upon all the things done and said at the time. An instruction with reference to robbery disassociated from the facts would have been unnecessary and improper. The issue of robbery, if gathered at all from the testimony, is to be gathered from all the facts testified to by appellant. We think the charge, when examined and measured by the facts in evidence, contained such a submission of the case that the jury could not have misunderstood appellant's rights, and could not have been misled thereby, but, on the contrary, when tested in its entirety, stripped of all legal phraseology, in a plain matter of fact

way, directed the jury that if appellant took his money purse out of his pocket, and deceased grabbed at it or knocked it out of his hands, and when appellant remonstrated with him, and asked him what he meant, deceased rushed upon him with a knife, and appellant immediately ran to his horse, seized his gun, and shot and killed Tanner, he should be acquitted."

The testimony of abandonment in this case all rested on and was raised by appellant's testimony. His testimony raised the issue of their settlement of their differences; his testimony, and his alone, raised the issue that he said to Snider that he was in a hurry, and his testimony, and his alone, raised the issue that he turned, shut up his knife, put it in his pocket and started to walk off. It is wholly unlikely that the jury would have believed one of these statements without believing the other, and where the defensive matters is submitted almost in the language of the evidence raising the defense, it would seem to be sufficient.

3. Again, it is complained there was error in the charge of the court on the subject of manslaughter. The court instructed the jury to this effect: That an assault and battery by deceased causing pain and bloodshed was adequate cause to reduce the offense if unlawful to the grade of manslaughter. That this charge was not technically accurate has been many times held. The language of the statute is: "An assault and battery by deceased causing pain *or* bloodshed is in law an adequate cause, and it is not required that both pain *and* bloodshed should be caused by the assault and battery, that either is sufficient." Foster v. State, 8 Texas Crim. App., 248; Tickle v. State, 6 Texas Crim. App., 623; Hill v. State, 8 Texas Crim. App., 142; Bonnard v. State, 25 Texas Crim. App., 173; Childers v. State, 33 Texas Crim. Rep., 509; Williams v. State, 15 Texas Crim. App., 617; High v. State, 26 Texas Crim. App., 545; Spivey v. State, 30 Texas Crim. App., 343. Since, however, appellant was found guilty of manslaughter and such finding of necessity was a finding adverse to his plea of self-defense, such error becomes utterly immaterial. Hobbs v. State, 55 Texas Crim. Rep., 299.

4. The other matters relate to complaints of the charge of the court with reference to the issue of self-defense. This charge we have carefully examined, and we think this issue was fairly submitted to the jury, and it is unnecessary to set the matter out in detail here.

A careful inspection of the entire record convinces us there was no such error of substance as injured appellant and for which we would be justified in reversing the judgment of conviction. Considered altogether, the case seems to have been well tried, and appellant was given the benefit of a fair submission of every issue arising under the evidence. The testimony was, we think, sufficient if believed to justify the conviction.

It is ordered that the judgment of conviction be and the same is hereby affirmed.

*Affirmed.*

## ON REHEARING.

### May 10, 1911.

PRENDERGAST, Judge.—We have carefully gone over and studied the record in this case in connection with the appellant's motion for rehearing and the opinion of this court heretofore rendered herein, and have reached the conclusion that the motion for rehearing should be overruled.

1. We have no doubt but that the issue of mutual combat was in this case, and the court did not err in submitting that issue to the jury.

To take the charge of the court as a whole, which must be done when different paragraphs of a charge are attacked, we think that the issue of mutual combat and the abandonment thereof so as to entitle the appellant to have the full benefit of his plea of self-defense, was correctly submitted to the jury.

With reference to the criticism of one paragraph of the charge in which the court tells the jury that the defendant decided to abandon the combat, we think the whole of the appellant's testimony on that subject, which called for the submission of this question to the jury, illustrates and emphasizes the saying of "actions speak louder than words." As shown both by the record and the original opinion herein, appellant's own testimony shows clearly that by his acts, if not by his specific words, he spoke to the deceased that he had abandoned the combat originally agreed upon when they left the deceased's house, so as to authorize the court to charge as it did on this subject.

2. As to the complaint of the charge of the court on the subject of manslaughter, wherein the court used the conjunctive instead of the disjunctive, wherein he told the jury, in effect, that an assault and battery by deceased causing pain *and* bloodshed was adequate cause, instead of charging that such assault and battery by deceased causing pain *or* bloodshed was adequate cause, we are of the opinion that there was no reversible error in this, for the appellant himself testified that the injuries inflicted upon him by the deceased with the club or stick with which he struck him caused him *both pain and bloodshed.* So that the jury could not have been misled by this charge; and in addition, to take the charge as a whole, we are of the opinion that this error was not calculated to and did not injure the rights of the defendant. Article 723, Code of Criminal Procedure.

3. And so on the question of the charge on self-defense, as stated above, in a charge on any given subject, the whole of it must be considered, and while some particular paragraphs of it may be subject to criticism, such criticism would not apply to the whole charge. The charge of the court on the subject of self-defense, in our opinion,

presents as favorably as the appellant was entitled all phases of his claimed self-defense, that was presented by this record.

. The motion for rehearing is therefore overruled.

*Overruled.*

HARPER, JUDGE.—This case was affirmed in an opinion handed down by Judge Ramsey June 15 of last year. On the motion for rehearing he and Presiding Judge Davidson disagreeing (Judge Mc-Cord being disqualified) it had not been decided when the personnel of the court changed the first of this year. On account of this disagreement, we invited and have heard oral argument in this case both for the State and defendant, and have given the record a close scrutiny. The court is still divided, Judge Prendergast having written an opinion overruling the motion, while Judge Davidson has prepared an opinion granting the motion and reversing the case.

It appears that a disposition of the case has finally narrowed down to the issues, did the court err in submitting to the jury the question of mutual combat, and if not, did he err in his charge on this issue. The defendant in this case testified:

"I had known deceased ever since he had been in that section of the country, and lived within a mile of him, or less, for a year. On the morning of the difficulty between deceased and myself I had started to go to D. A. Sanders, another neighbor of mine, for the purpose of going with him to Stephenville, and in doing so went by the home of deceased, on the regular road. I saw some of his calves in my cotton, and came on until I saw Calvin Snider, a son of deceased, standing on the gallery of his father's house. I then stopped and told the boy to tell his father to keep the calves out of my cotton. He replied that his father was in the house and that he would call him out and let me talk to him, and did do so. Deceased then came out and walked out to the gate where I was standing on the outside—in the lane, or by the fence. I had my knife in my hand at the time and was whittling on the top of a post oak bush which I had cut just after leaving my house. It is a habit with me to whittle, and I had no notion of having the knife out for any difficulty with deceased.

"I there told deceased that I wanted him to yoke his calves to keep them out of the field. He said that was all right, and that he would do so. I then said to him to be sure and do it, and don't let them get across in the other field, and then he said he could whip me. His words were: 'Damn you, I can whip you.' I then said to him: 'You are a preacher and you ought not to curse; if you think you can let's go on down the road,' and we went. He walked out and we went down the road together. I expect we went twenty or thirty yards before either of us spoke a word. Deceased then said: 'You and your neighbors have been tormenting me over the phone about my cattle.' I told him that I had not been phoning, but that I had

been down there once before about the cattle, but that I had not phoned. I do not recall what reply he made to this, and if there was anything said about McInrow phoning I do not remember it. I told him that it was not I.

"We then walked on and came to where that club was in the side of the road, and he stopped and made a little move as though to pick it up, and I told him not to do that. He then said to me: 'If you will put down that knife I will show you how quick this thing is done.' I told him I would not put the knife down, and about that time Lee Riley drove up, and as he did so he wanted to know what the trouble was. Deceased then said: 'Anthony is just blowing off,' or something to that effect, and then said if I would put up my knife he would show me how quick it was done. I told him I would not do that, and that I did not want to hurt him, if he would behave himself. But I did not want him to hit me with that stick. I was standing at one end of the stick. I do not remember which end, and we were close together. My back was east and we were standing on the south side of the road, he with his back towards the west, and were both standing that way at the time Lee Riley drove by. Riley drove on by, going west, and after he had passed I told deceased that if he wanted to do what was right we would not have any trouble. He then asked me what I wanted him to do, and I told him that I did not want anything except to keep the calves out of the field. He then said he was perfectly willing to do that, and when he told me that I then said to him that I was in a hurry, and turned and shut up my knife, and put it in my pocket and started to walk off. As best I recollect I made a step right to the edge of the road when he struck me with that big stick. He was right up against me at the time. When he struck me this right hand went down on the ground, and the next blow—I don't think I went quite to the ground. I don't know whether I was hit on the back or the breast; I just knew that I was struck again. By the time I got my knife out he was fixing to strike me again, and I dodged down and caught him, and I suppose then is when I stabbed him."

On this theory the court instructed the jury as to the law of murder in the first and second degrees as applicable to this case, but as the jury found the defendant guilty of manslaughter only, it is not necessary to discuss that portion of the charge.

On manslaughter the court instructed the jury: "18. Manslaughter is voluntary homicide committed under the immediate influence of sudden passion arising from an adequate cause, but neither justified nor excused by law. 19. By the expression, 'under the immediate influence of sudden passion' is meant: 1. The provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation. 2. The act must be directly caused by the passion arising out of the provocation. It is not enough that the mind is merely agitated by passion arising from

some other provocation. 3. The passion intended is either of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection. 20. By the expression 'adequate cause' is meant such as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection. The following are deemed adequate causes: 1. An assault and battery by the deceased causing pain and bloodshed. 2. A serious personal conflict in which great injury is inflicted by the person killed, by means of weapons or other instruments of violence, or by means of a great superiority of personal strength. 3. Any condition or circumstance which is capable of creating and does create passion, such as anger, rage, resentment or terror sufficient to render the mind incapable of cool reflection, is adequate cause. 4. And where there are several causes to arouse passion, although no one of them may be sufficient to constitute adequate cause, yet all of the causes combined may be sufficient to do so. 21. In order to reduce a voluntary homicide to the grade of manslaughter it is necessary not only that adequate cause existed to produce the state of mind referred to, that is, of anger, rage, resentment or terror, sufficient to render the mind incapable of cool reflection, but also that such state of mind did actually exist at the time of the commission of the offense.

"22. In this case, gentlemen, it is your duty in determining the adequacy of the provocation, if any, to consider in connection therewith all the facts and circumstances in the case, and if you find by reason thereof the defendant's mind at the time of the killing was incapable of cool reflection, and that such facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, the proof as to the sufficiency of the provocation satisfies the requirements of the law."

In addition thereto the court instructed the jury as follows:

"33. Moreover, gentlemen, if the defendant at the yard gate of the deceased agreed with the deceased to engage in a fight with deceased, and if at the time he intended to have only a fist fight with deceased, and did not intend to fight the deceased with a weapon, and did not intend to use a knife on deceased, and if pursuant to such intention, he went with deceased some distance from the yard gate and house of the deceased, and if at the place they stopped, the deceased struck or attacked the defendant with the large stick exhibited in evidence before you, or with any other stick and produced in his mind such a degree of anger, rage, resentment or terror, as to render it incapable of cool reflection, and that under such circumstances defendant killed the deceased by cutting and stabbing him with a knife, he would not be guilty of a higher grade of offense than manslaughter.

"34. Moreover, gentlemen, if the defendant at the yard gate of the deceased agreed to engage voluntarily in a combat with deceased,

either with the knife exhibited in evidence or without it, and with his fists, and if the defendant and the deceased left the yard gate and house of the deceased for the purpose and with the intention of engaging in a combat with each other, but after they had gone some distance from the yard gate and house of the deceased they stopped, and the defendant decided to abandon the combat and the agreement to have a combat, and so stated to the deceased, and started to turn and leave the deceased, and the deceased then struck or attacked the defendant with the stick exhibited in evidence before you or with any other stick, and in defense of himself against such attack by the deceased, the defendant killed the deceased by cutting and stabbing him with the knife exhibited in evidence, or if you have a reasonable doubt as to whether or not the killing occurred under such circumstances, the defendant would be justified in such killing.

"35. Moreover, gentlemen, if the defendant did not agree to fight the deceased unless attacked, and if the deceased attacked the defendant with the club or stick exhibited in evidence before you, or either of them, and the defendant killed the deceased in defense of himself against such attack, or if you have a reasonable doubt as to whether or not the killing took place under these circumstances, you will give the defendant the benefit of such doubt and acquit him."

As will be seen, after defining manslaughter, the court told the jury that if defendant did agree to engage in a fist fight and deceased attacked him with a stick, and defendant killed him under those circumstances he would not be guilty of any higher grade of offense than manslaughter; further instructing them, that if defendant did agree to have a fight with deceased, yet before the fight began, signified his willingness and intention to withdraw from or abandon such agreement, and deceased struck him with a stick he should be acquitted.

In addition thereto the court instructed the jury on the law of self-defense as follows: "25. Upon the law of self-defense you are instructed, gentlemen, that homicide is permitted by law when inflicted for the purpose of preventing the offense of murder, or the infliction of serious bodily injury, when the killing takes place under the following circumstances: 1. It must reasonably appear by the acts or by the words coupled with the acts of the person killed that it was the purpose and intent of such person to commit such murder, or inflict such injury. 2. The killing must take place while the person killed was in the act of committing such murder, or inflicting such injury, or after some act done by him showing evidently an intent to commit such murder or to inflict such injury.

"26. A party who is unlawfully attacked is not bound to retreat in any event to avoid the necessity of killing his assailant.

"27. It is not necessary to the right of self-defense that the danger should in fact exist, if it reasonably appears from the circumstances of the case that danger existed, viewed from the standpoint of the

defendant.   A person threatened with such apparent danger has the
same right to defend himself against it, and to the same extent that
he would have were the danger real; and in determining whether
there was reason to believe that danger did exist, the appearance
must be viewed from the standpoint of the party who acted upon them
and from no other standpoint.

"28.  In this case, therefore, if the defendant killed R. L. Snider,
he was justified in doing so, if he did so to prevent the said R. L.
Snider from murdering him or inflicting serious bodily injury upon
him, the defendant, provided, it reasonably appeared from the acts
or from the words, coupled with the acts of the said R. L. Snider,
that it was the purpose and intent of the said R. L. Snider to murder
or inflict serious bodily injury upon him, the defendant, and provided,
the killing took place while the said R. L. Snider was in the act of
murdering or of inflicting serious bodily injury upon the defendant,
or after some act done by the said R. L. Snider showing evidently
an intent to murder or inflict serious bodily injury ·upon the defend-
ant.  And in passing upon this matter you will view the circumstances
from the standpoint of the defendant alone.  And if you believe
from the evidence in this case that the killing took place under the
circumstances indicated in this paragraph of this charge, or if you
have a reasonable doubt as to whether it did, you will give the de-
fendant the benefit of such doubt and acquit him."

In the case of Habel v. State, 28 Texas Crim. App., 588, a case
less suggestive on the facts of mutual combat than the facts of this
case, this court says: "Insofar as murder of the first or the second
degree is concerned, all such questions are eliminated by the fact that
defendant has been convicted of manslaughter and not murder.  As
to manslaughter,. the charge embraced all the statutory rules with
regard to that crime.  Had defendant not been found guilty of
manslaughter the charge might have been held insufficient as not
pertinently applying the law of that grade of crime to the particular
facts of the case, and defendant, in a special requested instruction,
which was refused, attempted to call the attention of the court to the
omission.  The instruction was not itself the law, but was sufficient
to call the attention of the court to the necessity of an instruction
directly applicable to the facts.  An instruction was given by the court
with regard to mutual combat entered into where death or serious ·
bodily injury likely to result in death might ensue, and properly
instructed the jury that in such state of case self-defense would not
apply.  King v. The State, 4 Texas Ct. App., 54; Crist v. The State,
21 Texas Crim. App., 361; Thumm v. The State, 24 Texas Crim.
App., 667; Williams v. The State, 25 Texas Crim. App., 216; Will-
son's Crim. Stats., sec. 982.  But the court did not instruct as to
what the law would be if defendant went out to engage in a fisticuff
with deceased, and with no intention of having a deadly contest or

using a deadly weapon, and that his deadly weapon was only used after deceased was apparently about using a deadly weapon upon him. The facts, perhaps, called for some such instruction. But in such case the defendant's right of self-defense would not have been, as is insisted by counsel, a perfect one and entirely justifiable in law, but would have been imperfect to the extent of the gravity of the offense which he intended to commit originally. He went out to engage in an affray, which is a misdemeanor. (Penal Code, art. 313.) 'A perfect right of self-defense can only obtain and avail where the party pleading it acted from necessity and was wholly free from wrong or blame in occasioning or producing the necessity which required his action. If, however, he was in the wrong, if he was himself violating or in the act of violating the law, and on account of his own wrong was placed in a situation wherein it became necessary for him to defend himself against an attack made upon himself, which was superinduced or created by his own wrong, then the law justly limits his right of self-defense, and regulates it according to the magnitude of his own wrong.' Reed v. The State, 11 Texas Crim. App., 509; Willson's Crim. Stats., sec. 982. If the original wrong of defendant was or would have been a misdemeanor, then the homicide growing out of or occasioned by it, though in self-defense from an assault made upon him, would be manslaughter, if committed under the immediate influence of sudden passion arising from an adequate cause, such for instance as anger, rage, terror or resentment. Spearman v. The State, 23 Texas Crim. App., 224."

And in Pollock v. State, 32 Texas Crim. Rep., 29, the court, speaking through Judge Davidson, says: "'Mere words are not a fighting, within the definition of 'affray;' and if one, by insulting language, provokes another to attack him in a public place, but offers no resistance to the attack when made, he does not become guilty of this offense. If he were himself ready to fight, while the other gave the first blow, it would be otherwise.' 2 Bish. Crim. Law, sec. 2, and notes; The State v. Sumner, 5 Strob., 53; The State v. Perry, 5 Jones (N. C.), 9. Looking to the evidence the defendant, though reluctantly, entered the combat with some zeal, was 'rough' in his remarks, and vigorous in his efforts during the fight; and the fighting occurred in a public road. In this attitude of the case it is immaterial who struck the first blow, for both are guilty of the affray. Self-defense was not an issue in the case, and defendant could not justify his action on the ground that he did not strike the first blow."

Other authorities might be cited, but these state the law under the decisions of this court. It appears from defendant's own testimony that there was an agreement to fight. That when deceased said he could whip him, defendant replied, "If you think so come on down the road." He says that they afterwards agreed not to fight and he closed his knife and started off when deceased struck him. In the charge of the court both theories were presented to the jury for their

determination. We find nowhere in the record any suggestion of abandonment of the difficulty, other than in the testimony of defendant herein copied, and this, in an appropriate charge, the court tells the jury, if true, defendant should be acquitted. This was as favorable as defendant could expect, for if the rule announced in the Pollock case, supra, that having entered into an agreement to fight, and the fight resulting from this conversation, and he is shown to have entered into the combat with zeal when it started, he could not claim to have acted in self-defense. We do not think the charge of the court is subject to the criticism contained in appellant's brief. It was not for the court to determine these matters of fact, but to give in charge the law, and let the jury determine whether or not in the first instance whether or not there was an agreement to fight, and if there was, then whether or not there was an abandonment of the agreement to fight. The charge having submitted every issue raised by the evidence, and the jury found that defendant was guilty of manslaughter under the evidence, I concur in the judgment overruling the application for a rehearing.

DAVIDSON, PRESIDING JUDGE (dissenting).—I can not concur with my brethren in overruling the motion for rehearing. Appellant challenges the correctness of the opinion affirming the conviction, and presents tersely the issues as follows: First. If the issue of mutual combat be not in the case, the conviction should be set aside. Second. If the issue of mutual combat be held raised by the evidence, then the conviction should be affirmed, unless (1) the charges of the trial court upon the issue of mutual combat are erroneous; or unless (2) the charges of the trial court are erroneous and restrictive of the issue of self-defense; or unless (3) the charge of the court erroneously contributed to the maximum penalty for manslaughter, assessed by the jury.

Assuming that the issue of mutual combat is raised by the evidence, and pretermitting a present discussion thereof, we should meet squarely the contention of appellant that the charge on mutual combat was hurtfully wrong. The 33d paragraph of the court's charge reads as follows: "Moreover, gentlemen, if the defendant at the yard gate of the deceased agreed with the deceased to engage in a fight with deceased, and if at the time he intended to have only a fist fight with deceased, and did not intend to fight the deceased with a weapon, and did not intend to use a knife on deceased, and if pursuant to such intention, he went with deceased some distance from the yard gate and house of deceased, and if at the place they stopped, the deceased struck or attacked the defendant with a large stick exhibited in evidence before you, or with any other stick, and produced in his mind such a degree of anger, rage, resentment or terror as to render it incapable of cool reflection, and that under such circumstances defendant killed the deceased by cutting and stabbing him with a

knife, he would not be guilty of a higher grade of offense than manslaughter."

Appellant challenges the correctness of the foregoing charge in his motion for new trial. That clause of the motion for new trial is here copied:

"Because said charge is not the law in this State in any particular, and because if defendant agreed to fight deceased with his fists and went to the scene of the homicide or place where the killing occurred for that purpose, and on arriving there the deceased attacked and struck the defendant with a large stick exhibited in evidence, which was shown to be a deadly weapon, then such act on the part of the deceased, before any act was done by either of the parties in pursuance of the agreement to fight a fist fight, showed on the part of the deceased, an intention to abandon the agreement to have a fist fight, and to murder the defendant, and if defendant struck the deceased and killed him under such circumstances, such killing would be self-defense, inasmuch as the act of the deceased, in making such murderous assault, was a distinct and independent attack and assault to murder not contemplated by the parties and not contemplated by the terms of the proposed fist fight, but the same would constitute a specific and independent act disconnected from the former agreement which was only a misdemeanor, such attack or assault by deceased being an independent felony, and under such circumstances the defendant's act would be self-defense and entirely justifiable. And the defendant here now in this motion for a new trial excepts to said charge for the reasons herein stated."

Judge Ramsey, delivering the opinion, said: "And this is the question of difficulty in the case." The opinion then reviews authorities, which will be noticed later. This language is found in that opinion:

"The evidence in this case raised the issue, as we believe, of mutual combat. It may be true that where there is a mere agreement to fight with the fists, followed by no subsequent act in furtherance of such agreement, and thereafter one of the parties to the quarrel assaults his adversary with a deadly weapon, that the party so assaulted would, under the law, be allowed to protect himself and claim his perfect right of self-defense. However that may be, that doctrine can have no application here. In this case the evidence shows or at least justifies the conclusion that there had been an agreement to fight, and that the parties in pursuance of such agreement to fight, had left the house and were going to a more private place where the fight could be without interference or interruption. *This the law treats as a part of the combat, recognizing it as an overt act in furtherance and as a part of the combat.* There must in every case of mutual combat be a beginning of the fight by some one of the persons engaged in it. It would not be claimed in this case that if there was an agreement to fight by the parties, a leaving of the house to fight, that the mere fact that one struck the other before giving no-

tice in words of his intention so to do, that his adversary would be protected under the ordinary rule of self-defense. The fact that if the parties had agreed to fight with deadly weapons with a deliberate and set purpose, and one of them first draws his weapon and fires and either missing or not slaying his adversary, is in turn by him killed, it could not be claimed that the person killing acted in self-defense, but in such case, if the agreement was deliberately made, the offense would be murder in the first degree. And so it would seem under the authorities above cited that if the parties agreed to fight, not with deadly weapons, but one of them subsequently attacks his adversary with such means as that to save his life he must resort himself to the use of a deadly weapon, he does not go acquit, but if there is raised in his mind that degree of terror, rage or resentment, recognized by the law, the offense is manslaughter. *The books have not, so far as our examination has discovered, written at length the reasoning on which this rule is based, but it must be, as we believe, on the theory and proposition that both parties are, when the agreement to fight is made, and when they have done some act or acts in furtherance of such agreement, engaged in a violation of the law, and are culpable in some degree for any overt act done in furtherance thereof.* Again, we think the law must take some account of the fact that even if two persons do agree to fight in a given manner, that either wickedly designing to take some advantage of the adversary or moved by uncontrolled passion, one of them may strike with a deadly weapon, and that in considering their culpability, some knowledge of this fact must be assumed and presumed. So, that we believe the charge of the court in respect just considered is not only not objectionable, but is a fair and correct submission of a most difficult question."

Now, we return to the consideration of the charge given, construing it in the light of its applicability to the facts.

The undisputed facts show that appellant stopped at the yard gate of the deceased's home, and complained to deceased that his calves were getting into appellant's cotton field. The deceased said, "Damn you, I can whip you." Appellant replied, "If you think so, come on down the road." Deceased and appellant left the yard gate, and walked side by side down the road, about 200 yards, where they stopped, the appellant having an open knife in his right hand; a large stick was lying on the ground between the parties where they stopped. At this juncture the witness Riley, driving a pair of mules, drove up; the mules shied out of the road around the parties, and Riley passed on. When Riley appeared on the scene he saw the deceased and appellant standing facing each other, with a big stick that was subsequently used by the deceased lying on the ground between appellant and deceased, and appellant holding an open knife in his right hand. Riley asked what was the trouble? Snider, the deceased, replied, "Anthony is blowing about something, and if he

will put up that knife I will show him how quick it can be done."
Anthony said, "That he was not going to put up the knife, and that
he did not want to hurt Snider."

Appellant's testimony, after Riley reached them, was that in re-
sponse to Riley's inquiry, "What was the trouble?" Snider, the deceased,
said, "If Anthony will put up his knife I will show him how quick it
can be done." "I told him I would not do that, and that I did not
want to hurt him, if he would behave himself, but I did not want
him to hit me with that stick."

Preceding the arrival of Riley upon the scene, the action of appel-
lant and deceased is shown only by the testimony of appellant. He
states: "We walked on and came to where that club was at the side
of the road, and he stopped and made a little move as though to
pick it up. I told him not to do that." After Riley passed from
the scene, appellant's testimony and statements is the only evidence
as to subsequent occurrences resulting in the death of the de-
ceased. Appellant thus testified: "He (deceased) was standing at
one end of the stick. I do not remember which end, and we were
close together. My back was east, and we were standing on the south
side of the road, he with his back towards the west, and we were both
standing that way, at the time Lee Riley drove by. Riley drove on
by, going west, and after he had passed I told deceased that if he
wanted to do what was right we would not have any trouble. He
then asked me what I wanted him to do, and I told him that I did
not want anything except to keep the calves out of the field. He
then said he was perfectly willing to do that, and when he told me
that I then said to him that I was in a hurry, and turned and shut
up my knife and put it in my pocket and started to walk off. As
best I can recollect, I made a step right to the edge of the road when
he struck me with that big stick. He was right up against me at the
time. When he struck me, this right hand went down on the ground,
and the next blow—I don't think I went quite to the ground—I
don't know whether I was hit on the back or on the breast; I just
know that I was struck again. By the time I got my knife out he
was fixing to strike me again, and I dodged down and caught him,
and I suppose then is when I stabbed him.

"Snider would weigh about 170 pounds and was a tolerably stout
man, and was a younger man than I. My weight is 130 pounds
and age 46. I am not a strong man, and do not have good use of
my left hand and arm. The left hand was cut open by an accident
with an axe when I was a boy, and it is not as good as the other.
I do not believe that I would have had any show in a physical con-
test with deceased with my fists, and believe also that he could have
whipped me, and that is the reason I did not put up the knife. I
could not defend myself against him, and did not put up my knife
because I was afraid he would hit me with the stick. I knew I could

not hold my own with him at all with my fists. He was well built and larger than I. He could have tied me."

The State introduced in evidence statements made by appellant to several persons, which statements as to the res gestae were in accord with the defendant's version of the homicide.

The learned trial judge rightly instructed the jury, the rule obtaining where the State's case is sought to be made upon statements of the accused introduced in evidence by the State.

Now then, it is clearly apparent that the deceased began the fight. The foregoing 33d paragraph of the charge was based on this theory; not only that the deceased was the aggressor and began the fight, but that the deceased began the fight with a deadly weapon, and made a murderous assault upon the defendant. Such character of attack by the deceased was an issue presented by the evidence and was embodied in the foregoing charge.

And it will be borne in mind that no act is shown on the part of the appellant wherein he began the fight, or was in any sense the aggressor.

So much is said to emphasize the principle raised under the foregoing charge, *for it is conceded that if the appellant and the deceased agreed to fight, the appellant intending to have only a fist fight with the deceased, the deceased intending to have a deadly fight with the appellant, and under this status of the agreement to fight with the respective intentions of the parties as stated,* the appellant having only such intent to engage in a fist fight, began such character of fight, or became the aggressor therein, and the deceased responded with a deadly attack, this would be a mutual combat. The appellant could not justify, and the principle invoked in the foregoing paragraph of the charge of the court under discussion would be correct. The appellant would be guilty of manslaughter, and had the deceased killed the appellant under the above circumstances, given in the illustration, his offense would have been murder. Why? Because the essence of mutual combat is (1) an agreement to fight, express or implied; (2) the fight in pursuance thereof.

Mutuality of purpose and intent of the parties is the distinguishing principle of mutual combat as a general proposition, and this principle is apparent in the adjudicated cases. The very term "mutual combat" carries with it the meaning of mutuality, in mutual combat, as to which party strikes the first blow. In the principle of mutuality is found the reason of such rule, that it is immaterial which party strikes the first blow. And it may be soundly stated that when the reason for a rule ceases the rule has no application.

I have been speaking of mutuality as the distinguishing principle of mutual combat, as a general proposition.

To illustrate, where the agreement or intention, express or implied, is to fight a fist fight, no purpose to inflict death or serious bodily injury, or where the agreement or intention, express or implied, is

for a deadly fight, that is, where the purpose is to inflict death or serious bodily injury; where the combat is willingly entered into with mutual purpose or intent, there is no difficulty in determining the character of the combat, and in applying the law of mutual combat thereto.

Where the mutual combat is with nondeadly intent or character, and one kill the other, it is manslaughter. Where the mutual combat is with deadly intent or character, and one kill the other, it is murder.

How and why is it that the rule of mutual combat applies in the case between parties who have agreed to fight, express or implied, the one intending a fist fight, and the other intending to kill or inflict serious bodily injury, where the party intending a fist fight only begins the fight by striking the first blow, or being the aggressor therein?

The answer is sound and true to the principle involved in mutual combat. The agreement, express or implied, is to fight. The party intending only a fist fight, by his overt act, in striking the first blow, or becoming the aggressor in the fight, crosses the line between intention and crime; his purpose and intent has merged into an unlawful act, to wit, an assault.

The other party intending to kill or inflict serious bodily injury, his intent to kill or inflict serious bodily injury includes the lesser intent to fight; the lesser intent is included in the greater.

The parties would be respectively guilty of manslaughter or murder, as shown in the illustration hereinbefore given, based upon the theory of the appellant beginning the fight or being the aggressor therein, having the intent only to have a fist fight; and which illustration is the reverse of the issue presented in said foregoing charge.

Now, to further illustrate the proposition. Suppose A, with the intent to have a fist fight, assaults B; no matter what the purpose or intent of B; if A should kill B, his offense could be no less than manslaughter, for the act of A was unlawful at the outset, and his own wrong would abridge his right of self-defense, in the absence of an abandonment of the conflict by A.

Consider the illustration from B's standpoint; if in resisting a simple assault by A, he did so with the purpose and intent of killing A, using a deadly weapon, calculated to inflict death or serious bodily injury, and did kill A, his offense would not be less than manslaughter; for B was in the wrong in using more force than was reasonably necessary to protect himself from such simple assault.

Now then, suppose A and B agreed to fight, A intending to have a fist fight only, B intending to fight to kill; A begins the fight, becomes the agressor, by his overt act in so striking the first blow or becoming the aggressor, A has committed an unlawful act. He was the aggressor; he can not justify, and this would be true, whether A and B fought together willingly or not, because, as shown, A was the aggressor.

B enters into a fight, under an agreement, express or implied, but with the intent to kill, and in resisting A's simple assault, B with the original intention to kill, makes a deadly attack upon A, and kills him, B would be guilty of murder.

It will be seen that in the preceding illustration B in resisting A's simple assault, by reason of using more force than necessary, his offense would not be less than manslaughter, while as shown above, A being the aggressor in a simple assault, if B entered into the fight, under an agreement, express or implied, to fight, but with the original intent on his part to kill, and in resisting A's simple assault, B with the original intent to kill, makes a deadly attack upon A and kills him, B's offense would not be less than murder. Because the lesser intent to fight was merged in the greater intent to kill.

The foregoing views have been expressed to more clearly present the issues raised in appellant's challenge to the correctness of the foregoing 33d paragraph of the court's charge, and the distinction of the legal principles contended for under the facts arising under said charge.

Under said charge if there was an agreement to fight, the appellant intending to have a fist fight, the deceased intending to fight to kill, even though the deceased was the aggressor, and made a deadly assault upon the appellant with the stick, there was no escape for the appellant—his offense was manslaughter. Such is the proposition involved in said charge. Is it correct?

As above stated, it will be borne in mind that no act is shown on the part of appellant wherein he began the fight, or was in any sense the aggressor. There was no overt act on his part until after the attack upon him by the deceased with the stick in question. Such character of attack by the deceased was an issue presented by the evidence, and was embodied in the foregoing charge.

There can be no fight until the fight begins; there can be no combat, mutual or otherwise, until the combat begins. The plain principle of law, as well as inherent simple justice, forbids that a man should be bound by an agreement he never made, or with an intent that he never had.

The appellant insists that the opinion of this court, speaking through Judge Ramsey, is erroneous in approving said charge. *"Because the act of the defendant in going down the road with the deceased, was an overt act and a part of the combat."*

The language of the opinion on this point is as follows:

"In this case the evidence shows, or at least justifies the conclusion, that there had been an agreement to fight, and that the parties in pursuance of such agreement to fight, had left the house and were going to a more private place where the fight could be without interference or interruption."

*"This the law treats as a part of the combat recognizing it as an overt act and as part of the combat, . . .*

"The books have not so far as our examination has discovered written at length the reasoning on which this rule is based, but it must be as we believe, on the theory and proposition that both parties are when an agreement to fight is made, and when they have done some act or acts in furtherance of such agreement, *engaged in a violation of the law, and are culpable in some degree for any overt act done in furtherance thereof.*"

It is not held or contended by the opinion that a mere agreement to fight is an overt act. A mere intention to fight standing alone is not punishable as a crime under our Penal Code. The opinion, however, does hold that the walking down the road, on the part of appellant and the deceased, coupled with the agreement to fight was, in law, a part of the combat, an overt act. I can not agree to this as a correct proposition of law, nor can it be correctly held to be law.

Suppose there had been no fight, would the acts so designated as part of the combat be punishable by law? If an agreement to fight and walking down the road together is a part of the combat, could there be an abandonment then? How could there be culpability in any degree for a thing done in furtherance of an agreement to fight, if there was no fight?

Self-defense, predicated on threats, is recognized as part of the law of homicide; yet in order for the slayer to justify, the deceased must at the time have done some act reasonably indicating the purpose or intent to carry such threat into execution; some act done by the deceased as an overt act, and upon which self-defense predicated upon the threats must stand.

Would the mere presence of the party making the threats, though armed, in the absence of some overt act indicating a purpose to carry his threats into execution, be sufficient to justify defensive action? The unbroken rule of decisions in Texas is to the contrary.

An overt act at the time of the homicide creating apprehension or fear of death at the time is the basis of self-defense, bottomed upon actual or apparent danger.

An overt act in an assault or homicide, is aggression, a thing done that brings on the fight at the time thereof. Agreements to fight, threats, grudges, menaces, the going or coming together, have no relation as any part of such overt act. Their evidentiary purpose is to characterize or shed light upon the motives, purpose and intent of the parties. Common law writers upon mutual combat have never held that the act of going to the place where the fight is to take place, is an overt act, constituting a part of the combat; nor has there been any holding by the common law writers, that mutual combat could exist without an agreement, express or implied, and a commencement of the fight.

So far as the writer is advised, it never has been held that the going to the place of the fight, with the intent to fight, was an overt act, constituting a part of the mutual combat.

Russell on Crimes, vol. 1, page 529, lays down the rule that two things must occur to constitute mutual combat. Mutual agreement or intent to fight, express or implied, and the fight based thereon. It is the fight that merges the agreement or intent into crime.

Mere preparation for a fight unaccompanied by the demonstration or overt act, does not impair the right of self-defense. Meuley's case, 26 Texas Crim. App., 307.

Judge Lumpkin, of Georgia, in the case of Barton v. State, 23 S. E., 827, says: "Neither the evidence, nor the prisoner's statement in the case now under consideration warranted the finding by the jury that Barton, the accused, ever entered into a mutual intention or agreement with Nasworthy, the deceased, to fight with deadly weapons.

"It seems quite clear that Barton was willing to fight with Nasworthy, a rough and tumble fight, of the kind described by Judge Longstreet in 'Georgia Scenes,' but when Barton saw that Nasworthy, after procuring an exceedingly dangerous weapon, manifestly intended that the fight should be of a deadly character, he, Barton, did all in his power to decline a struggle of this kind. He did not use his pistol until it became absolutely necessary to do so in order to protect himself from the consequences of the murderous assault which Nasworthy was actually making upon him."

The judgment for manslaughter was reversed and the case remanded. Judge Lumpkin, in the case, supra, further says: "What constitutes a case of mutual combat is well settled by the authorities, and need not here be repeated. When, however, two persons, by agreement, go out to fight a fair fight, without weapons, and when they reach the place of combat one only of them adheres to the purpose or intent to a fight of this kind, and the other abandons this purpose, and forms a manifest intention to attack his adversary with a deadly weapon, it is not only the right but the duty of the latter to decline to participate in a deadly combat that is imminent. Indeed, strictly speaking, no person should enter into an agreement to go out and fight a fight of any kind, but certainly when he bargains for an old-fashioned 'fist and skull fight' he is not bound to enter into a combat involving the lives of both himself and his enemy. If the latter should insist upon having a deadly fight, the other party in good faith declines to enter into it, seeks to withdraw from it, he may then stand upon his defense and justifiably use whatever force may be necessary to protect himself."

It will be seen from the foregoing quotation that the going out of the parties together to have a fight forms no part of the overt act of the fight itself. And under the logic of this eminent judge, it could in no sense be held that the going down the road of the appellant with the deceased was a part of the combat, or an overt act forming a part of the combat.

The foregoing charge of the court is clearly wrong, unless it can be held that the going of the appellant down the road with the de-

ceased constituted an overt act, and a part of the combat. I am clearly of the opinion that it can not be so regarded. The charge of the court complained of was error upon which the case should be reversed.

In the opinion in this case Judge Ramsey uses this language: "It may be true that where there is a mere agreement to fight with the fists, followed by no subsequent acts in furtherance thereof, and thereafter one of the parties to the quarrel assaults his adversary with a deadly weapon, that the party so assaulted would, in the law, be allowed to protect himself, and claim his perfect right of self-defense."

The right of self-defense is not settled in the language used. It would seem under Judge Lumpkin's opinion in the case cited, supra, that one agreeing and intending only to fight a fist fight, and going with the party to the quarrel to the place of the fight, does not lose his right of self-defense if his adversary changes his opinion and makes a deadly assault. The language in the opinion in this case last above quoted, "followed by no subsequent act in furtherance of such agreement," too broadly states the restrictive limitations upon the right of self-defense.

The following portion of the opinion affirming this case is attacked by appellant in his motion for a rehearing, to wit:

"Again, special objection is made of so much of the 34th paragraph of the court's charge above quoted as instructs the jury that if after the parties had gone some distance, they stopped, 'and the defendant decided to abandon the combat and the agreement to have a combat, and so stated to the deceased, and started to turn and leave the deceased, and the deceased then struck or attacked the defendant with the stick,' and that in defense of himself against such attack the defendant killed the deceased, or they had a reasonable doubt the killing occurred under such circumstances, that he would be justified. This charge is complained of because if appellant had abandoned the combat or agreement to have a combat his right of self-defense would be perfect, and he would not be required to notify deceased of such abandonment or to start to turn and leave before his right of self-defense would be perfect. In determining the accuracy of every charge the court should always do so with reference to the facts of the case, and consider the charge of the court as a whole. As will appear from the statement of the case given above, appellant testified that he told deceased that if he wanted to do what was right there would be no trouble, and deceased then asked him what he wanted him to do, and that he told him he wanted nothing except for him to keep his calves out of the field; that deceased said he was perfectly willing to do that, and thereupon appellant said, 'When he told me that I then said to him that I was in a hurry and turned and shut up my knife and put it in my pocket and started to walk off,' and that when he made a step to the edge of the road that he struck him

with a big stick. It will be noted, therefore, that the charge of the court follows accurately and almost literally the testimony of appellant, and submits the issue of abandonment as stated by him. The charge is to the effect that if the jury should find, not that he had in fact abandoned the difficulty, but if he had decided to abandon the combat and agreement to have a fight and so stated to the deceased and started to turn and leave him, and deceased then struck him, that his right of self-defense would be perfect. We can imagine many cases where this charge would be erroneous. Where there has been in fact an abandonment of a prior agreement of mutual combat, it is not, we think, essential that one's adversary must, at the peril of his life be notified of such abandonment, but where, as in this case, the evidence of abandonment raises the issue not only of a decision so to do, of notice of that fact, and of a step taken to leave the presence of such adversary, and the issue is submitted, applying the law directly to the facts of the case, we can not concede that such charge is error. It would perhaps have been better if the court in this case had instructed the jury that if notwithstanding they believed that there had been an agreement for mutual combat, if appellant had abandoned same, that his right of self-defense would not be impaired. Still we think where the court does submit the very facts of the case to the jury that it can not be said, if error, to be such error as would either justify or require this court to reverse the case. Indeed, it might be claimed with some reason that the jury would better understand and comprehend such charge where given than one that abstractly or generally submitted the issue."

The opinion then quotes from the Welch case, 122 S. W. Rep., 880, in support of the conclusion reached, that quotation being as follows: "It will thus be seen that under this instruction, if the jury believed or had a reasonable doubt in their minds, that while appellant and deceased were discussing the matter about the purchase of a pistol, appellant took out his money purse, and thereupon deceased grabbed same, or knocked it out of his hands, and thereupon the defendant remonstrating with or asking him (deceased) what he meant, the deceased rushed upon the defendant and struck him with a knife, and appellant immediately ran to his horse, seized his gun and shot and killed Tanner, then in case the jury should so find, or if they had a reasonable doubt that such were the facts, or as to the fact that deceased so attacked defendant with a knife, they would acquit him. This charge applies the very facts relied upon by appellant. . . . We think the charge, when examined and measured by the facts in evidence, contained such a submission of the case that the jury could not have misunderstood appellant's rights, and could not have been misled thereby, but on the contrary, when tested in its entirety, stripped of all legal phraseology, in a plain matter of fact way, directed the jury that if appellant took his money purse out of his pocket, and deceased grabbed at it or knocked it out of his hands,

and when appellant remonstrated with him, and asked him what he meant, deceased rushed upon him with a knife, and appellant immediately ran to his horse, seized his gun and shot and killed Tanner, he should be acquitted."

The opinion in this case then concludes as follows: "The testimony of abandonment in this case all rested on and was raised by appellant's testimony. His testimony raised the issue of their settlement of their differences; his testimony, and his alone, raised the issue that he said to Snider that he was in a hurry, and his testimony, and his alone, raised the issue that he turned, shut up his knife, put it in his pocket, and started to walk off. It is wholly unlikely that the jury would have believed one of these statements without believing the other, and where the defensive matters are submitted almost in the language of the evidence raising the defense, it would seem to be sufficient."

Appellant insists that the Welch case, supra, does not support the conclusion reached in this, that the Welch case did submit all of the facts to the jury, and that the 34th paragraph of the charge of the court did not submit all of the facts to the jury in this case, upon which the issue of abandonment of the agreement to fight was presented by the evidence, but arbitrarily and erroneously restricted said issue of abandonment to the time after Riley had driven past and upon the testimony of the defendant as follows:

"After Riley had passed I told the deceased that if he wanted to do what was right, we would not have any trouble. He then asked me what I wanted him to do, and I told him I did not want anything except that he keep the calves out of the field. He then said he was perfectly willing to do that, and when he told me that I then stated to him that I was in a hurry, and turned and shut up my knife and put it in my pocket and started to walk off. As best I can recollect, I made a step to the edge of the road, when he struck me with that big stick."

Appellant insists that the issue of abandonment arose under other phases of the evidence than that submitted in the charge of the court in the 34th paragraph, namely:

That the deceased was greatly the physical superior of the appellant; that they walked down the road side by side, about 200 yards, the deceased unarmed, the appellant armed with an open knife in his right hand, and stopped in the road with a stick between them, which the deceased started to pick up, when appellant told him not to do that.

That it was not essential to abandonment that the appellant so state to the deceased. That under said evidence the disparity in the size of the men, the distance traveled, the fact that no attack was made by the appellant, although armed, and the deceased unarmed; and that in the light of the statement made to the deceased by appellant, that he did not want to hurt him, if he would behave him-

self, but that he did not want deceased to hit him with that stick, raised the issue of abandonment prior to the time restricted in the charge as stated in the opinion, and which was supported by the testimony of Riley as well as that of the defendant.

In the case of Pace v. State, 61 Texas Crim. Rep., 436, 135 S. W. Rep., 381, this court said: "It is not the province of the court to decide what issues of fact suggested during the trial shall be submitted to the jury. Wherever there is an issue in a case made by the testimony, the law applicable thereto should be given by proper instruction. The court may not believe the testimony, but this would be immaterial. Under our laws the jurors are the judges of the facts, the weight of the testimony and the credibility of the witnesses.

"It is the province of the court to submit the law on these issues to the jury. The court can not directly or indirectly say to the jury that the testimony on one phase of the case is not to be credited, and another phase is to be believed. The jurors are the judges of these matters."

This holding has been the unbroken line of decisions in this State. An examination of the Welch case, 57 Texas Crim. Rep., 111, supra, shows that all of the facts were submitted by the court in its charge. If, therefore, the issue of abandonment in this case was raised by any other facts or phase of facts than presented in the charge of the court, or disclosed in the opinion, then the Welch case would not be authority sustaining the opinion herein rendered, or of the said charge complained of.

I am of opinion that the contention of appellant is correct on the issue of abandonment raised in the facts contended for by appellant as hereinbefore set forth, and that the charge was erroneous in restricting said issue to the particular facts selected and presented in the charge of the court. It is the province of the jury to pass upon said issue of abandonment in the light of all the evidence.

Especially cogent is the suggestion that the issue of abandonment was raised, when appellant said to deceased in the presence of Riley, "I won't put up my knife; I don't want to hurt you if you will behave yourself, but I don't want you to strike me with that stick." This language clearly implies that the appellant stood only upon the defensive; that it was not his purpose to fight unless in protection of himself.

The charge of the court excluded this, and all preceding conduct of the parties from the consideration of the jury, by confining the issue of abandonment to a subsequent time above stated in the charge and the opinion, and in effect thereby told the jury that what occurred before would not constitute abandonment, and rested the issue of abandonment solely upon the testimony of the defendant.

What occurred in the presence and hearing of Riley, showing that appellant did not want to hurt the deceased, etc., was consistent with the theory of abandonment, if any agreement to fight existed, and

consistent with the facts upon which said issue of abandonment was submitted in the charge, and greatly strengthened the issue of abandonment.

The charge was upon the weight of the evidence, and to the erroneous hurt of appellant.

A reexamination of the court's charge upon self-defense sustains the appellant's contention as to the error therein. It is true that the charge on self-defense instructed the jury to view the appearance of danger and the facts and circumstances from the standpoint of defendant. But nowhere do any of the charges instruct that the appearance of danger must be viewed from the standpoint of the defendant at the time of the homicide.

The contention of appellant as to the error in said charge can be characterized by a quotation from the Bell case, 20 Texas Crim. App., 445, wherein Judge Hurt, speaking for the court, said:

"But to whom must the appearance of danger, . . . apprehension of the party killing, . . . reasonably appear? To the jury after they have heard all of the evidence, after ascertaining the real facts, a great many of which may not, could not, and doubtless were not known to the defendant at the time of the killing? Or must the real or apparent danger appear to the defendant at the time of the homicide, to be reasonable? We think the latter is correct.

"Each juror must place himself in the position of the defendant at the time of the homicide, and determine from all the facts as they appeared to the defendant at the time of the killing, whether his apprehension or fear of death or serious bodily harm was reasonable; if so, they should acquit.

"We think the appellant is correct in his criticism of the charge upon manslaughter. The court charged the jury that adequate causes for manslaughter were as follows, to wit: 'An assault and battery by the deceased, causing pain and bloodshed. Serious person conflict in which great injury is inflicted by the person killed, by means of weapons or other instruments of violence, or by means of great superiority of personal strength.' " Serious bodily injury by the charge is made grounds of self-defense; whereas, great injury inflicted in a serious personal conflict, was made adequate cause for manslaughter. The statute provides that pain or bloodshed is adequate cause for manslaughter, and further provides as adequate cause for manslaughter the following:

"A serious personal conflict, in which great injury is inflicted by the person killed by means of weapons or other instruments of violence, or by means of great superiority of personal strength, although the person guilty of the homicide were the aggressor; provided, such aggression was not made with intent to bring on the conflict and for the purpose of killing."

Great and serious injury creating apprehension of death, or constituting serious bodily injury, under the law, is made self-defense.

The charge of the court did not clearly, succinctly and definitely present the issue of manslaughter, and to say the least, whether said charge would constitute reversible error standing alone, yet it was misleading, and may have contributed to the infliction upon the defendant of the maximum penalty of five years for manslaughter. Wherever this is the case, it has been held by this court, that such error will require a reversal of the conviction.

I have discussed the case under the preceding views expressed, upon the assumption of the existence of the issue of mutual combat. It may be seriously questioned as to whether such issue is in the case. The theory of mutual combat is based upon the following language of the parties, the deceased saying: "Damn you, I can whip you," and appellant replying, "If you think so come on down the road."

There is a broad distinction between an agreement to fight and a refusal to be whipped. Under the record · it nowhere appears that appellant could be held as provoking the difficulty, or doing anything as the aggressor in the conflict, resulting in the death of the deceased. I do not think that the issue of mutual combat is in the case. But, without reference to my views upon that subject, upon the assumption that the issue of mutual combat is in the record, the charge upon said issue was clearly erroneous.

For the reasons herein given, I think the judgment should be reversed and the cause remanded.